# Illinois Official Reports

## Appellate Court

***

### *People v. Carter*, 2020 IL App (3d) 170745

***

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. JONATHAN A. CARTER, Defendant-Appellant. |
| District & No. | Third District<br>No. 3-17-0745 |
| Filed | June 9, 2020 |
| Decision Under Review | Appeal from the Circuit Court of Tazewell County, No. 17-CF-204; the Hon. Stephen A. Kouri, Judge, presiding. |
| Judgment | Affirmed. |
| Counsel on Appeal | James E. Chadd, Peter A. Carusona, and Bradley P. Popurella, of State Appellate Defender's Office, of Ottawa, for appellant.<br><br>Stewart J. Umholtz, State's Attorney, of Pekin (Patrick Delfino, Thomas D. Arado, and Justin A. Nicolosi, of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People. |
| Panel | JUSTICE CARTER delivered the judgment of the court, with opinion.<br>Justices Holdridge and McDade concurred in the judgment and opinion.<br>Justice McDade also specially concurred, with opinion. |

¶ 1        On appeal, defendant, Jonathan A. Carter, alleges that the circuit court erred in denying his amended motion for a new trial for his claims of (1) ineffective assistance of counsel and (2) error in polling the jury. We affirm.

## I. BACKGROUND

¶ 2

¶ 3        The State charged defendant with residential burglary (720 ILCS 5/19-3(a) (West 2016)), possession of a stolen firearm (*id.* § 24-3.8(a)), and unlawful possession of weapon by a felon (*id.* § 24-1.1(a)). The indictment for count I alleged that defendant knowingly and without authority entered into the dwelling place of Jordan Himmel with the intent to commit theft. In count II, the indictment alleged that defendant knowingly possessed a firearm, knowing it to be stolen and without being entitled to possess the firearm. In count III, the indictment alleged that defendant, a person who had been convicted of a felony, knowingly possessed a firearm while on parole. All charges were alleged to have occurred on or about November 11, 2016.

¶ 4        The parties, and the circuit court, agreed that the trial would be bifurcated with counts I and II being tried first. Then, when the jury returned a verdict on those two charges, the matter would proceed to count III. Specifically, the court would read to the jury the lone item of additional evidence, via stipulation, which was defendant's prior felony conviction.

¶ 5        Prior to trial, defense counsel made an oral motion *in limine*, stating:

> "[Megan Haupt] cooperated with the State and provided a statement concerning these allegations, but in the process of her interview also made other allegations concerning my client, other bad acts if you will, uncharged at this point. I'm simply moving that the State make sure that she does not wander into that area of prior bad acts or other allegations that she may or may not have direct knowledge of in the course of her direct examination."

The State indicated it had no objection.

¶ 6        Also, prior to trial, the following colloquy occurred:

> "[THE STATE]: I mentioned to defense counsel I'll be soliciting information from one of the witnesses, Megan Haupt, that they were coming from buying drugs [when] their car broke down at the location of the offense and then they took the stolen weapon to another drug house in exchange for drugs. I would be seeking to enter that information. He acknowledged that he understood that and he did not have a problem with it.
>
> [DEFENSE COUNSEL]: That's correct, Judge. *** [D]uring her interview, she did say that. I think that that's actual information I prefer to have in evidence, so I'm not objecting to that. She made allegations of other days, other incidents *** prior to her interview which [was] about three months after this [incident]. *** So as far as when with this incident—
>
> THE COURT: This transaction?
>
> [DEFENSE COUNSEL]: Yes. I'm just looking at preliminary matters, where they were coming from, where they went afterwards allegedly. I'm okay with that."

¶ 7      During opening statements, the State indicated that Haupt would testify that "she and her boyfriend, [defendant], were on their way back from Peoria from buying drugs." Specifically, Haupt testified that she and defendant were in a dating relationship on November 11, 2016. On that day, defendant and Haupt travelled to Peoria, where they bought drugs. After leaving Peoria, they proceeded to Havana so Haupt could retrieve her paycheck. Haupt explained that their car broke down in front of a residence prior to reaching Havana. They approached the residence in an attempt to get some gasoline, but no one was home. Haupt then began to look around the yard, where she found a gasoline can and filled it with gasoline from a tank nearby. Haupt took the can and used the gasoline to fill up their car. She then put the can in the trunk of the car. The car still did not start.

¶ 8      At some point, while Haupt was outside, defendant entered the residence. Defendant told Haupt that he found guns in the residence. Haupt testified that defendant returned to the car and called someone who agreed to pick them up in exchange for a ride back to Peoria. Later, she clarified that she believed defendant called a person who sent someone to give them a ride to Peoria and provide them with drugs in exchange for a gun. Defendant went back into the residence and returned with a gun. Haupt and defendant then started walking to a nearby town. Eventually, an unidentified person picked them up and drove them to Peoria. She testified that she was unsure if the person who picked them up was the same person with whom they later exchanged the gun for drugs. On direct examination, Haupt was asked:

"Q. And what were you doing in Peoria?

A. Getting drugs.

\* \* \*

Q. \*\*\* What did you do after you left the residence with the firearm?

A. We went back to Peoria.

Q. For what purpose?

A. To sell the gun.

Q. For what?

A. For drugs."

¶ 9      On redirect examination, Haupt was asked:

"Q. \*\*\* During your relationship with the defendant, were you doing drugs with the defendant?

A. Yes.

Q. Was he doing drugs with you?

A. Yes.

Q. Okay. And you also testified that you went back to get your paycheck a few days later, is that correct?

\* \* \*

A. Yes

Q. Okay. And you testified that you went to go buy more drugs with your paycheck?

A. Yes.

Q. Okay. And did [defendant] do those drugs with you?

A. Yes."

¶ 10      The homeowner of the residence defendant entered, Jordan Himmel, testified that a .45 caliber pistol, three magazines, and a speed loader were missing from his residence. Himmel reported these items missing on December 7, 2016. He was unsure whether they were missing or stolen. Himmel stated that he was out of town one weekend in the beginning of November and had left his front door unlocked. He also indicated that he had gasoline cans located at his residence, one which he also reported missing. Himmel testified that after he returned from his trip, he noticed a white Pontiac Grand Am parked near the end of his driveway. He called the police department, which eventually towed the car. Officers discovered defendant's belongings as well as a gasoline can in the trunk of the car. Himmel identified the gasoline can as the one that was missing from his property.

¶ 11      During closing arguments, the State said, "It's a little unclear as to who picked them up, but at some point the individual that they had contacted to sell the gun to for both a ride and drugs, they made contact with that individual and they went back to Peoria and did more drugs."

¶ 12      While the jury was deliberating, the following colloquy took place:

"THE COURT: *** I want to go over just what we're going to do with this Phase 2. When they come back, we will take the verdict. I'll ask if anybody needs the jury polled. And then—although I wonder if I could even hold off on the polling of the jury?

[THE STATE]: Until complete.

THE COURT: Yes. Why don't I. Unless there is an objection to that, I will hold off on that.

[DEFENSE COUNSEL]: That's fine."

¶ 13      The court continued outlining its suggested method for handling the reading of the indictment and whether the parties would waive opening statements on the third charge and stipulate to the remaining evidence. The State indicated that they would waive opening statements and that they had a stipulation with defense counsel to address the remaining evidence. The court inquired if the parties would be giving closing arguments, and the State indicated that it would not.

¶ 14      The court then stated:

"So if you are waiving argument, I want you to do that on the record in front of [the jury] and make sure. I will read them the instructions, and additional instructions. I will remind them that the packet of instructions that they already have will be equally applicable and then we will send them back to deliberate on the last count."

Defense counsel responded, "That's fine."

¶ 15      The jury reached a guilty verdict on counts I and II. The court subsequently explained count III to the jury. Both defense counsel and the State waived opening and closing statements and stipulated to the evidence already heard on the first two counts in addition to defendant's felony conviction. The parties confirmed there was no additional evidence from either party. The court then sent the jury back to deliberate on count III. Ultimately, the jury returned with a verdict of guilty on count III. At this time, the court told the jury that his clerk, "will ask each one of you was this, meaning all three of the verdicts, was this your verdict when you signed it and is it still your verdict." When asked this question by the clerk, the jurors individually confirmed their verdicts.

¶ 16                                 II. ANALYSIS

¶ 17        On appeal, defendant first contends that his defense counsel rendered ineffective assistance because counsel failed to object to the introduction of evidence or comments referencing Haupt and defendant's drug use. Of the four specific ineffective allegations that defendant raises, we find that three involve trial strategy. The remaining allegation of the State's questions of defendant's drug use is improper, though not prejudicial.

¶ 18        Defendant also contends that he was prejudiced due to an error in the manner that the jury was polled. Specifically, defendant argues that the jury should have been polled after the first two verdicts were returned in this bifurcated trial. It is unclear whether defendant asserts the trial court or defense counsel is at fault for the alleged error and how the error prejudiced him. We find that there was no error committed by the trial court and defense counsel was not ineffective.

¶ 19        To determine a claim of ineffective assistance of counsel, the defendant must satisfy both prongs under *Strickland*: (1) that counsel's performance fell below an objective standard of reasonableness and (2) that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. *Strickland v. Washington*, 466 U.S. 668, 687-88, 694 (1984); *People v. Colon*, 225 Ill. 2d 125, 135 (2007). The court gives a great amount of deference to counsel's judgment and indulges a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance. *Strickland*, 466 U.S. at 689.

¶ 20        Defendant alleges counsel was ineffective for failing to object on four separate occasions where the State either asked Haupt about defendant's drug use or referenced his drug use in their opening and closing arguments. Defendant alleges the following improper evidence: (1) in opening statements, the State said that Haupt and defendant left Peoria where they bought drugs when their car broke down; (2) the State asked Haupt where she and defendant went after they left the residence with the firearm and what they did with the firearm in Peoria; (3) the State asked if during Haupt's relationship with defendant, they did drugs together; and (4) in closing arguments, the State said after Haupt and defendant received a ride back to Peoria to sell the gun for drugs, they did drugs together. We first begin by analyzing three allegations in conjunction with one another. We will then analyze the fourth allegation separately.

¶ 21        We begin by addressing statements (1), (2), and (4) with the following facts in mind. Prior to trial, defense counsel agreed to allow the testimony of preliminary matters at trial, which included "[w]here [defendant and Haupt] were coming from, where they went afterwards." Defense counsel specifically did not agree to testimony elicited about any day or acts outside of November 11, 2016. He made an oral motion prior to trial and asked that the State be barred from asking Haupt about any other bad act allegations concerning defendant. The State had no objection, with the exception of possible rebuttal evidence. Implicitly, this agreement allowed testimony about what Haupt and defendant participated in together on November 11, 2016.

¶ 22        The allegations in statements (1), (2), and (4) are covered by the agreement between the parties. Here, the question is whether defense counsel was deficient in bringing in allegations of Haupt's drug use. We find that he was not. This was reasonable trial strategy for counsel. By allowing the testimony on these matters, counsel was able to cross-examine and impeach Haupt on her drug use, specifically for the date of the alleged offense. This preliminary

information was necessary to impeach Haupt, who was the only witness to the crime. Without the ability to cross-examine Haupt on her drug use, especially on the day of the crime, her credibility could have been left untarnished. All that would be left was her testimony that defendant burglarized a house and stole a gun.

¶ 23   As for allegation (3), the testimony elicited by the State about defendant's drug use in general was outside the scope of the agreement and improper. The State indicated it would be seeking testimony from Haupt about what she and defendant did on November 11, 2016, specifically, "that they were coming from buying drugs [when] their car broke down at the location of the offense and then they took the stolen weapon to another drug house in exchange for drugs." As previously stated, defense counsel requested that other bad acts not related to the date of the offense be barred. This information could not be used to impeach Haupt. The admission of defendant's drug use in no way could benefit his defense. Defense counsel did not agree to the questioning of defendant's drug use. He agreed to the questioning of the narrative of that day—where the witness was, with whom, and why. When the State asked Haupt about defendant's drug use several days after the incident and during Haupt's relationship with him, it went outside the scope of the agreement. These questions were improper and warranted an objection.

¶ 24   It cannot be said that defense counsel was deficient for failing to object to these questions. There is no reasonable probability that, but for this testimony, the result of the trial would have been different. See *id.* at 694. Haupt testified as an eyewitness to the crimes charged. Her testimony outlined what she and defendant did over the course of a day. Haupt's story about where they were, when, and what was taken was corroborated by the other evidence. Himmel testified that he was out of town one weekend in the beginning of November and left his front door unlocked. When he returned, Himmel saw a white car with no occupants near the end of his driveway. Himmel said that in early December 2016, he noticed that his gun and a gasoline can from his garage were missing. Later, when officers recovered the towed vehicle, they discovered defendant's personal items and Himmel's gasoline can in the vehicle's trunk. This corroborated Haupt's testimony about the car they were driving that day and about Haupt's taking the gasoline can from the garage after the car broke down outside of the residence. We find that, given the other evidence in this case, the improper questions by the State do not overcome the prejudice prong of the *Strickland* test or rise to the level of reversible error.

¶ 25   Turning to defendant's second argument, he states in the headnote, "The trial court erred in polling the jury after all the verdicts had been entered in this matter as opposed to after the first part of the bifurcated hearing." Defendant begins his argument by citing cases that discuss a defendant's right to have the opportunity to poll a jury. Defendant then says that "the trial court did not afford either the [S]tate or the defendant the opportunity to request a poll of the jury prior to the procession to part two of the bifurcated hearing, which addressed the matters in count III." He states later, "It is arguable that this prejudiced the defendant further as to ineffective assistance of counsel, as the defense attorney did not push this matter. By not arguing the same, there is extreme prejudice to the defendant ***. The defendant should likewise be afforded a new trial on this issue." It is unclear precisely who defendant is purporting to have committed error or what that error is. In the interest of clarity, we will analyze both the trial court's method and the absence of defense counsel's specific request or objection to the manner the jury was polled.

¶ 26    A defendant has a substantial right to poll the jury. *People v. Herron*, 30 Ill. App. 3d 788, 791 (1975). The opportunity to poll the jury occurs "after the return of a verdict, but before it is accepted and recorded." *People v. Rehberger*, 73 Ill. App. 3d 964, 968 (1979).

> "The polling of a jury is intended to ascertain whether any juror had been coerced into agreeing upon a verdict—coerced by his associate jurors. *** The trial court, on polling, must determine that the jury verdict accurately reflects each juror's vote as reached during deliberations and that the jurors' votes were not the result of force or coercion. Once that has been determined, the purpose of the polling process has been served." (Internal quotation marks omitted.) *People v. Williams*, 97 Ill. 2d 252, 307 (1983) (citing *People ex rel. Paul v. Harvey*, 9 Ill. App. 3d 209, 211 (1972), citing *Ritchie v. Arnold*, 79 Ill. App. 406, 409 (1898)).

The circuit court has discretion to determine the manner in which the jury is polled, due to being in the best position to make that determination. *People v. Chandler*, 88 Ill. App. 3d 644, 650 (1980); *People v. Wheat*, 383 Ill. App. 3d 234, 238 (2008).

¶ 27    Given the facts of this case, and defendant's claim of ineffective assistance of counsel, we do not accept the State's argument that the jury polling issue was forfeited for lack of a contemporaneous objection at trial. See *People v. Enoch*, 122 Ill. 2d 176, 186 (1988). Defendant alleges that it was error not to poll the jury after the first two verdicts were returned. On this point, it is, again, unclear whether defendant alleges that the fault belongs to the trial court or defense counsel. As to both arguments, we find no error. We will first examine whether the trial court's polling procedures were erroneous.

¶ 28    As previously stated, the court has the discretion to determine the mode and manner of polling a jury. See *Chandler*, 88 Ill. App. 3d at 650. After discussing with the parties, and hearing no objection, the court determined that it would wait until all verdicts were returned to poll the jury on all three counts. The record reveals that the court did poll the jury and that jurors gave affirmative responses when asked to confirm their verdicts. The jurors had an "opportunity to disclose any coercion, mistake, or dissention from the verdict announced." *Williams*, 97 Ill. 2d at 308. At this point, in the absence of any juror indicating their dissent, the votes were deemed cast without coercion, and the purpose of the poll was satisfied. See *id.* at 307. Further, the jury was polled on the verdicts prior to the verdicts being accepted and recorded. See *Rehberger*, 73 Ill. App. 3d at 968. We find the manner the court implemented satisfied the purpose of polling the jury; therefore, no abuse of discretion occurred.

¶ 29    In coming to this conclusion, we reject defendant's assertion it is "arguable that this prejudiced the defendant." Specifically, he claims he was not afforded the opportunity *to request* to poll the jury after the first two verdicts were returned. Defendant fails, however, to show that he, in fact, did not have an opportunity *to request* to poll the jury prior to the jury hearing the third charge. Simply put, counsel could have made a request at any time after the first two verdicts were returned. More importantly, however, it is clear from the record that a discussion took place between defense counsel and the court on this specific matter. At that time, the trial court addressed how it would poll the jury after all three verdicts were returned. The court asked defense counsel if he had any objection to that procedure, and counsel responded, "[t]hat's fine." Defendant simply fails to show how the manner used by the trial court in polling does not satisfy the purpose of polling a jury, which is to ensure "unanimity among the jurors." *Wheat*, 383 Ill. App. 3d at 237. Given that the manner used to poll the jury did satisfy the purpose of a jury poll, we find that defendant was not prejudiced when the jury

was polled after all three verdicts were returned. The above facts and circumstances belie any argument defendant has regarding polling the jury.

¶ 30    Lastly, we note that any purported claim of ineffective assistance with regard to defense counsel's representation on the manner of polling lacks merit. Again, no error was committed in the manner of polling the jury, and defendant was not prejudiced. *Supra* ¶¶ 28-29.

¶ 31                                     III. CONCLUSION

¶ 32    The judgment of the circuit court of Tazewell County is affirmed.

¶ 33    Affirmed.

¶ 34    JUSTICE McDADE, specially concurring:

¶ 35    I concur in the decision to affirm the circuit court's denial of defendant's motion for a new trial alleging claimed ineffective assistance of counsel and judicial error in polling the jury.

¶ 36    I write separately and briefly to address one of defendant's specific allegations of improper admission of evidence—the one we have agreed was improper but have found was not prejudicial.

¶ 37    Defense counsel attempted to protect his client from the admission of evidence that was potentially prejudicial and irrelevant to the pending case. The purpose of resolving the possible negative impact in advance of the trial is to avoid making an issue in the presence of the jury of the very information sought to be excluded. Here, defense counsel made his request, and the State and trial court agreed. However, rather than honoring the agreement, the prosecutor asked the witness, Megan Haupt, a question structured to elicit the precise testimony he had agreed should be excluded. This put defense counsel in the untenable position of having to either ignore the testimony or risk calling undue and potentially detrimental attention to it by objecting to the question and supporting the objection.

¶ 38    In the instant case, it is highly unlikely that an acknowledgment of more of the same *type* of relatively benign conduct already admitted would lead the jury to convict where it otherwise would not; accordingly, we have found it was not prejudicial *to the defendant*. That finding does not mean, however, that it is not prejudicial to our judicial system. We may, in my opinion, be fairly confident that if the violation of the agreement works once with impunity, there *will* be a next time, and the next time the breach may not be harmless at all.