NOTICE
This Order was filed under
Supreme Court Rule 23 and is
not precedent except in the
limited circumstances allowed
under Rule 23(e)(1).

2024 IL App (4th) 240520-U

NO. 4-24-0520

IN THE APPELLATE COURT

FILED
December 11, 2024
Carla Bender
4th District Appellate
Court, IL

OF ILLINOIS

FOURTH DISTRICT

| | | |
|---|---|---|
| ROBERT L. SCHILLING, | ) | Appeal from the |
|     Plaintiff-Appellant, | ) | Circuit Court of |
|     v. | ) | Adams County |
| QUINCY PHYSICIANS & SURGEONS CLINIC, | ) | No. 18L53 |
| S.C., d/b/a QUINCY MEDICAL GROUP and KREG J. | ) | |
| LOVE, D.O., | ) | Honorable |
|     Defendants-Appellees. | ) | Scott D. Larson, |
| | ) | Judge Presiding. |

JUSTICE ZENOFF delivered the judgment of the court.
Justices Knecht and DeArmond concurred in the judgment.

**ORDER**

¶ 1   *Held*: The appellate court affirmed a judgment in favor of defendants in a medical malpractice action where the trial court acted within its discretion by (1) denying plaintiff's counsel's motions for a mistrial, (2) refusing to conduct further polling of the jury, and (3) using the phrase "failed to diagnose" rather than the word "misdiagnosed" in a jury instruction.

¶ 2       Plaintiff, Robert L. Schilling, filed this medical malpractice action against defendants, Dr. Kreg J. Love, D.O., and his employer, Quincy Physicians & Surgeons Clinic, S.C, d/b/a Quincy Medical Group. The jury returned a verdict in favor of defendants. Plaintiff appeals, arguing the trial court should have (1) declared a mistrial, (2) polled jurors more extensively following the verdict, and (3) given a jury instruction that used the word "misdiagnosed" rather than the phrase "failed to diagnose" to recite plaintiff's allegations of negligence. We affirm.

¶ 3                               I. BACKGROUND

¶ 4    The issues plaintiff raises on appeal do not require us to present a detailed overview of the evidence. It will suffice to say the following. Between January 12 and 26, 2017, plaintiff, who was diabetic, sought treatment for left foot pain and swelling with his primary care physician, Dr. Love. Dr. Love treated plaintiff with antibiotics for an infection (cellulitis) before eventually referring him to a podiatrist. On January 30, 2017, the podiatrist ordered an X-ray and discovered plaintiff had multiple fractures, which required surgeries and ultimately amputation of his foot.

¶ 5    Summarized briefly, plaintiff's theory was that Dr. Love was negligent for failing to order an X-ray and failing to instruct plaintiff not to bear weight on the affected foot. According to plaintiff, had his fractures been diagnosed sooner through an X-ray, he would have recovered without surgery or amputation. Defendants' theory was that Dr. Love properly treated plaintiff for cellulitis, which was the most likely cause of the symptoms at the time. Defendants also contended it was impossible to know whether plaintiff's outcome would have been different had Dr. Love ordered an X-ray or instructed plaintiff not to bear weight on the affected foot.

¶ 6    Plaintiff's complaint alleged that Dr. Love "[f]ailed to diagnose" the fractures. During trial, plaintiff took the position that such failure to diagnose inherently constituted a misdiagnosis. At the jury instructions conference, plaintiff tendered an instruction that included the proposition that he claimed defendants were negligent in that they "[f]ailed to diagnose broken bones." However, plaintiff tendered an alternative to this instruction that included the proposition that he claimed defendants were negligent in that they "[m]isdiagnosed the broken bones." Defense counsel objected to the alternative instruction on three bases: (1) there was no testimony that Dr. Love misdiagnosed broken bones, (2) this instruction was confusing and misleading, and (3) the word "misdiagnosed" came from the medical records of plaintiff's surgeon, who was not offered as a standard-of-care expert. Plaintiff's counsel argued that this was an issue of semantics, as a

failure to diagnose was the same thing as a misdiagnosis. Plaintiff's counsel also told the trial court he was "not sure there was ever confirmation or not about" the cellulitis and that he was "just referencing the misdiagnosis of the broken bones." The court ruled it would instruct the jury about a failure to diagnose rather than a misdiagnosis. The court reasoned it did not want to confuse the jury or have the jury read too much into the word "misdiagnosed," as there was no evidence here of "what you would traditionally consider a misdiagnosis." The court added: "I think it's improper to use misdiagnosed here when we're talking about the negligence of a family practice physician and the [word] misdiagnosis came from the expert testimony of the orthopedic surgeon." Despite the court's ruling, and without an objection from the defense, during closing argument, plaintiff's counsel asserted the jury could decide what it meant and whether it was important that plaintiff's surgeon used the word "misdiagnosed."

¶ 7        After six days of testimony, the jury began its deliberations at 2:25 p.m. on November 1, 2023. At 5:10 p.m., the jury submitted a note asking whether it was to read and interpret plaintiff's allegations of negligence "as they are written or as we preceive [*sic*] the evidence." With the parties' agreement, the trial court instructed the jury that the instructions contained the law and the jury's job was to determine and apply the facts to the law. At 6:22 p.m., the jury sent a note asking questions about the meanings of "negligance" [*sic*] and "standard of care." With the parties' agreement, the court instructed the jury that those terms were defined in the instructions given previously. At 7 p.m., the jury submitted the following note: "It is very obvious that we will not come to an agreement unanimously. Sitting in here for hours and hours will not make a difference." Neither the parties nor the court proposed giving a *Prim* instruction at this point, which is a pattern instruction designed for purportedly deadlocked juries. See Illinois Pattern Jury Instructions, Civil, No. 1.05 (approved Dec. 8, 2011) (hereinafter IPI Civil No. 1.05);

*People v. Prim*, 53 Ill. 2d 62 (1972). Rather, the parties agreed to provide the following response to the jury: "Please continue your deliberations. We will check in with you shortly." At 7:55 p.m., the court discharged the jury for the evening.

¶ 8            The jury recommenced deliberations at 9:02 a.m. on November 2, 2023. At 9:40 a.m., a juror who was never identified submitted the following handwritten note, which the parties refer to in their appellate briefs as the "Surrender Note":

> "For the record, I will sign the verdict for the defendant Dr[.] Love. I am firm in my support for the plaintiff Mr. Shilling.
>
> I am only signing to end this deliberation and put an end to this. After many hours of discussion and debate, we cannot come to a unanimous decision. Therefore, it's my position to sign *only* to end this.
>
> I 100% believe Dr[.] Love was negligent in providing the appropriate care to his patient. As a result, Mr[.] Schilling['s] overall care was impacted because of Dr[.] Love[']s decision.
>
> Once again, I am *only* agreeing to sign to end this." (Emphases in original.)

Plaintiff's counsel moved for a mistrial, arguing the Surrender Note showed the jury was deadlocked and that any forthcoming verdict would be a product of undue influence. Defense counsel, on the other hand, requested the trial court give the jury a *Prim* instruction. Plaintiff's counsel contended a *Prim* instruction might have been appropriate the previous night but that the issue raised by the Surrender Note was "incurable."

¶ 9            The trial court denied the motion for a mistrial and explained to the parties it would give a *Prim* instruction without seeking to ascertain the numerical division of the jury. The court denied plaintiff's counsel's request to attempt to determine which juror authored the Surrender

- 4 -

Note. The court brought in the jury, confirmed with the foreperson that she believed the jury was deadlocked, and provided the following *Prim* instruction both orally and in writing:

> "The verdict must represent the considered judgment of each juror. In order to return a verdict, it is necessary that each juror agree to it. Your verdict must be unanimous. It is your duty, as jurors, to consult with one another and to deliberate with a view to reaching an agreement, if you can do so without violence to individual judgment. Each of you must decide the case for yourself, but do so only after an impartial consideration of the evidence with your fellow jurors. In the course of your deliberations, do not hesitate to re-examine your own views and change your opinion if convinced it is erroneous. But, do not surrender your honest conviction as to the weight or effect of evidence solely because of the opinion of your fellow jurors or for the mere purpose of returning a verdict. You are not partisans. You are judges—judges of the facts. Your sole interest is to ascertain the truth from the evidence in the case."

The jury returned to its deliberations at 10:10 a.m.

¶ 10    At 10:20 a.m., the jury sent the following note: "Please provide clarification of the phrase 'deviation from standard of care' and 'professional negligence.' Is this to be interpreted as 'neglect?' WE NEED A CLEAR INTERPRETATION! What exhibit is Dr[.] Honnakers [*sic*] deposition? Would like to review." With the parties' agreement, the trial court provided the following response to these questions: "The information requested is contained in the jury instructions you have been provided[.] The exhibits for you to review are in your possession."

¶ 11    While the jury was still deliberating, plaintiff's counsel reiterated his request for a mistrial based on the Surrender Note. The trial court denied this motion.

- 5 -

¶ 12 At 11 a.m., the jury informed the trial court it had reached a verdict. Plaintiff's counsel requested the court poll the jurors before the verdict was announced. The court ruled it would poll the jurors afterward by asking each person whether this was then and is now his or her verdict. The court explained to the parties that if any juror provided a dissent or a "qualified answer" during polling, the court would have a further discussion with that juror outside the presence of the other jurors. Plaintiff's counsel responded that although he did not object to this procedure, he believed the Surrender Note indicated a juror already had a "dissenting opinion." Thus, plaintiff's counsel proposed that even if all jurors indicated during polling that this was then and is now their verdict, the court should ask each juror whether he or she wrote the Surrender Note; upon identifying the author, the court should ask that juror whether he or she had changed his or her opinion since writing the Surrender Note. The court denied plaintiff's counsel's request for enhanced polling of this nature.

¶ 13 The jury returned a verdict for defendants signed by all 12 jurors. However, the foreperson also signed an incomplete verdict form for plaintiff before crossing out her name. The trial court's clerk asked each juror whether this was then and is now his or her verdict. All jurors responded, "Yes." The court discharged the jury but asked the foreperson to stay. Upon questioning by the court, the foreperson explained she signed the verdict form for plaintiff erroneously. She confirmed that the defense verdict was her decision, and nobody forced her or coerced her to sign a verdict for defendants.

¶ 14 After the trial court discharged the foreperson, plaintiff's counsel stated for the record that juror No. 34 (who was not the foreperson) gave "a clear and obvious hesitation" and sighed loudly before saying "Yes" to the clerk's question during polling. Neither defense counsel nor the court disputed plaintiff's counsel's representation that juror No. 34 hesitated and sighed.

Plaintiff's counsel renewed his motion for a mistrial and asked the court not to accept the verdict. The court denied those requests, reasoning that (1) sentiments like those documented in the Surrender Note are likely often expressed during jury deliberations though not reduced to writing and (2) it would improperly delve into the jury's decision-making process to question jurors after they answered "Yes" to the clerk's polling question. The court entered a judgment on the verdict.

¶ 15     Plaintiff filed a postjudgment motion, which the trial court denied. The court reconfirmed its views that it appropriately (1) gave a *Prim* instruction in response to the Surrender Note, (2) denied plaintiff's counsel's request for enhanced polling, and (3) refused to instruct the jury using the word "misdiagnosed." Plaintiff filed a timely notice of appeal.

¶ 16                              II. ANALYSIS

¶ 17                         A. Requests for a Mistrial

¶ 18     Plaintiff maintains the trial court abused its discretion by failing to declare a mistrial upon receiving the Surrender Note. Plaintiff's central points are: (1) he was deprived of his right to a unanimous jury verdict, as the Surrender Note showed that a juror disagreed with the verdict and would side with the majority merely to end deliberations; (2) the Surrender Note was indicative of juror misconduct; (3) the *Prim* instruction was inherently coercive in light of the Surrender Note and because the jury was already hopelessly deadlocked; and (4) the verdict was an improper "compromise verdict." A common theme through plaintiff's argument is that the juror who authored the Surrender Note made a promise, guarantee, or assurance to return a verdict based on improper considerations. Plaintiff submits this juror fulfilled such a promise and that it would be speculation to assume the juror changed his or her opinions during deliberations after receiving the *Prim* instruction.

¶ 19 Defendants respond that the trial court properly denied plaintiff's counsel's motions for a mistrial and provided a *Prim* instruction. In defendants' view, plaintiff merely speculates that the juror who wrote the Surrender Note did not change his or her opinions during deliberations after receiving the *Prim* instruction.

¶ 20 Generally, "[a] mistrial should be granted when there is an occurrence of such character and magnitude as to deprive a party of a fair trial and the moving party demonstrates actual prejudice as a result." *Tirado v. Slavin*, 2019 IL App (1st) 181705, ¶ 31. One such example is where a trial court determines the jury is "hopelessly deadlocked." *People v. Wolf*, 178 Ill. App. 3d 1064, 1066 (1989). Whether to declare a mistrial is a matter committed to the "sound discretion of the trial court." *Slavin*, 2019 IL App (1st) 181705, ¶ 29. A reviewing court will not reverse such a decision absent an abuse of discretion, which occurs where "no reasonable person would take the view adopted by the trial court." *Slavin*, 2019 IL App (1st) 181705, ¶ 29.

¶ 21 Trial courts are in the best position to evaluate whether continued deliberations will allow the jury to reach a just verdict. *People v. Kimble*, 2019 IL 122830, ¶ 37. Some factors a court may consider in deciding whether to declare a mistrial based on jury deadlock include: " '(1) statements from the jury that it cannot agree, (2) the length of the deliberations, (3) the length of the trial, (4) the complexity of the issues, (5) the jury's communications to the judge, and (6) the potentially prejudicial impact of continued forced deliberations.' " *People v. Richardson*, 2022 IL App (2d) 210316, ¶ 40 (quoting *Kimble*, 2019 IL 122830, ¶ 38).

¶ 22 If a trial court does not believe a mistrial is warranted based on deadlock, the court must avoid employing "coercive means" to pressure the jury to reach a verdict. *Kimble*, 2019 IL 122830, ¶ 37. One historically common method of coercion was to tell jurors who held a minority viewpoint they should reevaluate their positions and consider that the jurors in the majority heard

the same evidence. *Prim*, 53 Ill. 2d at 73. Sensitive to the possibility of coercion, in *Prim*, our supreme court adopted the American Bar Association's standards for addressing potentially deadlocked juries. *Prim*, 53 Ill. 2d at 75-76. Those standards are codified as IPI Civil No. 1.05:

> "The verdict must represent the considered judgment of each juror. In order to return a verdict, it is necessary that each juror agree to it. Your verdict must be unanimous.
>
> It is your duty, as jurors, to consult with one another and to deliberate with a view to reaching an agreement, if you can do so without violence to individual judgment. Each of you must decide the case for yourself, but do so only after an impartial consideration of the evidence with your fellow jurors. In the course of your deliberations, do not hesitate to re-examine your own views and change your opinion if convinced it is erroneous. But, do not surrender your honest conviction as to the weight or effect of evidence solely because of the opinion of your fellow jurors or for the mere purpose of returning a verdict.
>
> You are not partisans. You are judges—judges of the facts. Your sole interest is to ascertain the truth from the evidence in the case."

¶ 23    Upon a close review of the circumstances here, we hold that the trial court did not abuse its discretion by denying plaintiff's counsel's requests for a mistrial. The parties took six days to present their evidence, much of which was medical testimony. Approximately four and a half hours into its first day of deliberations on November 1, 2023, the jury submitted a note that stated: "It is very obvious that we will not come to an agreement unanimously. Sitting in here for hours and hours will not make a difference." Although the court would have been within its discretion to give the *Prim* instruction at this point, neither party asked for such instruction. Rather,

cognizant that the jury would soon be sent home for the evening, the parties agreed to tell the jury: "Please continue your deliberations. We will check in with you shortly."

¶ 24         Thirty-eight minutes after the jury recommenced its deliberations on November 2, 2023, the trial court received the Surrender Note:

> "For the record, I will sign the verdict for the defendant Dr[.] Love. I am firm in my support for the plaintiff Mr. Shilling.
>
> I am only signing to end this deliberation and put an end to this. After many hours of discussion and debate, we cannot come to a unanimous decision. Therefore, it's my position to sign *only* to end this.
>
> I 100% believe Dr[.] Love was negligent in providing the appropriate care to his patient. As a result, Mr[.] Schilling['s] overall care was impacted because of Dr[.] Love[']s decision.
>
> Once again, I am *only* agreeing to sign to end this." (Emphases in original.)

Contrary to what plaintiff asserts, the Surrender Note was not necessarily a promise, guarantee, or assurance that the author was intent on returning a verdict for an improper purpose. A different reasonable interpretation is that the author simply wanted to get the court's attention about the perceived deadlock, especially considering the court did not provide any guidance when the jury first declared itself deadlocked the previous night. Significantly, after approximately six hours of deliberations, the jury did not return a verdict contemporaneously with the Surrender Note, but instead awaited a response from the court. This strongly suggests the Surrender Note was a plea for guidance rather than confirmation that the author had truly and permanently abandoned his or her duties and convictions. Although plaintiff is correct that the Surrender Note was not something

- 10 -

that is "routine" in a jury trial, the court reasonably rejected plaintiff's counsel's suggestion that the situation was incurable and required declaring an immediate mistrial.

¶ 25　　　　For the same reasons, plaintiff's claim that the Surrender Note evinced juror misconduct is unpersuasive. "Courts should be exceedingly vigilant and careful that there is no misconduct on the part of jurors that would reflect any question on the honesty of their performance." *Miller v. Scandrett*, 326 Ill. App. 631, 637 (1945). Here, plaintiff contends that "(1) the juror assured the Court he was going to enter a verdict solely to end deliberations" and "(2) this statement represents a clear unwillingness to continue deliberations or deliberate in good faith in such a way where the author was willing to reverse his or her opinion." However, the juror who authored the Surrender Note plainly was taking his or her duties seriously, as he or she was passionate at that point in time, based on the evidence presented, that plaintiff proved his malpractice claim. This is a far cry from *United States v. Fattah*, 914 F.3d 112, 140-43 (3d Cir. 2019), a case plaintiff cites in which a juror purportedly had an axe to grind with the government, refused to listen to other jurors, screamed at them, put his hand on a fellow juror, and told a deputy he was intent on a hung jury. Here, the trial court reasonably viewed the Surrender Note as an indication the jury continued to view itself as deadlocked, not that a juror had committed misconduct.

¶ 26　　　　The trial court was careful to follow the procedures outlined in the committee notes to IPI Civil No. 1.05 and to avoid any response to the Surrender Note that could be deemed coercive. For example, plaintiff's counsel requested the court question jurors about the Surrender Note. The court properly refused to do so, as this likely would have identified both the author of the note and whether the author was the lone holdout. See IPI Civil No. 1.05, Committee Note (establishing that before giving this instruction, a court should question the foreperson about

- 11 -

whether the jury is able to reach a verdict but avoid soliciting information about the numerical division of the voting). Some courts have suggested that when a court learns both the numerical division of a purportedly deadlocked jury and the identities of the jurors holding the minority viewpoint, that increases the risk that jurors in the minority may feel the court is singling them out through further instructions. See *United States v. Williams*, 547 F.3d 1187, 1207 (9th Cir. 2008) (recognizing the possible coercive effect of instructing a jury to continue deliberating when the court knows both the numerical split of the jury and the identities of the jurors holding the minority viewpoint). Here, the court acted within its discretion by limiting its inquiry to asking the foreperson whether she believed the jury was deadlocked. When she responded in the affirmative, the court gave the *Prim* instruction.

¶ 27       Plaintiff argues the *Prim* instruction was unwarranted, as the jury was already hopelessly deadlocked by the time the trial court received the Surrender Note. However, the court had discretion to assess whether and when the jury was hopelessly deadlocked. Considering the length and complexity of this trial, it is not surprising the jury failed to reach a consensus within the first five or six hours of deliberations. We also consider that the jury had not been given a *Prim* instruction before the court received the Surrender Note. *Contra Richardson*, 2022 IL App (2d) 210316, ¶¶ 41, 43 (holding that the trial court should have declared a mistrial where jury deliberations exceeded the length of the trial testimony and where the jury declared itself deadlocked after being given a *Prim* instruction).

¶ 28       Plaintiff maintains the *Prim* instruction itself was coercive in light of the Surrender Note. This argument is untenable, as our supreme court adopted this instruction specifically to avoid the possibility of undue coercion and trial courts are given broad discretion to determine whether circumstances require a mistrial. When a court determines a jury should be instructed on

a subject, the court must use the pattern instruction approved by our supreme court unless such instruction "does not accurately state the law." Ill. S. Ct. R. 239(a) (eff. Apr. 8, 2013). Thus, there is no merit to plaintiff's position that the *Prim* instruction was coercive.

¶ 29 Accordingly, we hold that the trial court acted within its discretion by giving the *Prim* instruction rather than declaring a mistrial upon receiving the Surrender Note.

¶ 30 Plaintiff also presents arguments about events that happened after the trial court gave the *Prim* instruction. Specifically, plaintiff argues he was deprived of his right to a unanimous verdict, the verdict was akin to an improper "compromise verdict," and it would be speculation to assume the author of the Surrender Note changed his or her opinion about the case during subsequent deliberations. These arguments are unpersuasive. Plaintiff was not deprived of his right to a unanimous verdict, as all 12 jurors signed a verdict for the defense and all jurors answered in the affirmative when asked whether this was then and is now their verdict. Additionally, in a strictly legal sense, an improper "compromise verdict" is where a jury assesses damages far lower than what the uncontested evidence warrants, thus raising suspicions that the jury did not actually agree about liability. See *Svetanoff v. Kramer*, 80 Ill. App. 3d 575, 578 (1979). Here, the jury returned a verdict for the defense and awarded plaintiff no damages. There was no discrepancy between liability and damages, so this does not meet the criteria for an improper "compromise verdict."

¶ 31 Plaintiff's argument about speculation does not change our analysis. Juries deliberate in private, so courts are not privy to the discussions. The premise of plaintiff's contention regarding speculation is that the juror who authored the Surrender Note made a promise, guarantee, or assurance that he or she would return a verdict for the defense despite his or her convictions and then fulfilled that promise. We repeat, an unknown juror wrote the Surrender Note

before the trial court gave a *Prim* instruction, which expressly informed jurors not to surrender their honest conviction as to the weight or effect of evidence solely because of the opinion of fellow jurors or for the mere purpose of returning a verdict. We presume that jurors follow the instructions given to them. *First Midwest Bank v. Rossi*, 2023 IL App (4th) 220643, ¶ 174. After being given the *Prim* instruction, the jury continued its deliberations, asked for clarification regarding the law governing the merits of the case, and returned a verdict for the defense. All jurors then indicated during polling that this was then and is now their verdict. Under the circumstances, plaintiff's point about speculation does not convince us the court abused its discretion by denying a mistrial.

¶ 32                    B. Plaintiff's Counsel's Request for Additional Polling

¶ 33           Plaintiff next argues that in light of the Surrender Note, the trial court erred by refusing to poll the jury beyond asking each juror whether this was then and is now his or her verdict. Plaintiff submits it was also "problematic" that one juror "sighed loudly, and hesitantly answered 'yes' " during poling. Plaintiff notes that the court questioned the foreperson about coercion, and he contends the court should have done the same for all the jurors. Plaintiff proposes that if additional polling of the jury was inappropriate, that only supports his previous argument that the court should have declared a mistrial upon receiving the Surrender Note.

¶ 34           Defendants respond that the trial court properly refused to conduct further polling of the jury after each juror answered "Yes" to the clerk's question. According to defendants, pauses and sighs do not require additional polling. Defendants argue that additional polling would have intruded on the jurors' decision-making process.

¶ 35           Our supreme court has said the following about polling juries:

"When a jury is polled, each juror should be questioned individually as to whether the announced verdict is his own. The poll should be conducted so as to obtain an unequivocal expression from each juror. [Citation.] The very purpose of the formality of polling is to afford the juror, before the verdict is recorded, an opportunity for free expression unhampered by the fears or the errors which may have attended the private proceedings of the jury room. [Citation.] In conducting the poll, each juror should be examined to make sure that he truly assents to the verdict. [Citation.]

The trial court may use its discretion in selecting the specific form of question to be asked in the polling process as long as a juror is given the opportunity to dissent. The double-barreled question used in this case, 'Was this then and is this now your verdict?' has often been used in Illinois. [Citation.] We see nothing wrong with using this question in polling the jury. However, if a juror indicates some hesitancy or ambivalence in his answer, then it is the trial judge's duty to ascertain the juror's present intent by affording the juror the opportunity to make an unambiguous reply as to his present state of mind. [Citation.] Jurors must be able to express disagreement during the poll or else the polling process would be a farce and the jurors would be bound by their signatures on the verdict. Before the final verdict is recorded, a juror has the right to inform the court that a mistake has been made, or to ask that the jury be permitted to reconsider its verdict, or to express disagreement with the verdict returned. If the trial judge determines that any juror does dissent from the verdict submitted to the court, then the proper remedy is for the trial court, on its own motion if necessary, to either direct the jury to retire for

further deliberations [citation], or to discharge it [citation]." (Internal quotation marks omitted.) *People v. Kellogg*, 77 Ill. 2d 524, 527-29 (1979). Nevertheless, courts "must be careful not to make the polling process another arena for deliberations." *Kellogg*, 77 Ill. 2d at 529.

¶ 36 When reviewing a challenge to polling procedures, we must keep in mind that the trial court was tasked with determining whether each juror freely assented to the verdict. *Kellogg*, 77 Ill. 2d at 529. Whereas we review the cold record, the trial court heard each juror's response and observed each juror's demeanor and tone of voice. *Kellogg*, 77 Ill. 2d at 529. We will overturn a verdict based on polling procedures only where "the interrogation precludes the opportunity to dissent or if the record reflects that the juror in the poll has not in fact assented to the verdict." *Kellogg*, 77 Ill. 2d at 529. "A trial court's determination as to a juror's voluntariness of his assent to the verdict will not be set aside unless the trial court's conclusion is clearly unreasonable." *People v. Cabrera*, 116 Ill. 2d 474, 490 (1987).

¶ 37 We hold that the trial court's method of polling the jury was not clearly unreasonable and did not amount to an abuse of discretion. The question the clerk asked each juror—whether this was then and is now his or her verdict—is a standard polling question that has been approved by our courts. See *Kellogg*, 77 Ill. 2d at 528 (our supreme court saw "nothing wrong" with this question); *People v. Carter*, 2020 IL App (3d) 170745, ¶¶ 15, 28 (finding no defect in polling where each juror answered in the affirmative when asked, " '[W]as this your verdict when you signed it and is it still your verdict[?]' "). Significantly, no juror here responded to the polling question by manifesting dissent to the verdict or providing an ambiguous answer. *Contra Kellogg*, 77 Ill. 2d at 529-30 (additional polling was required where a juror asked during polling whether she could change her vote); *People v. Beasley*, 384 Ill. App. 3d 1039, 1044-45,

1049 (2008) (additional polling was required where a juror responded to the question " '[I]s this your verdict?' " by shaking his head and saying, " 'Um—I have to say, yes, I guess.' "). We recognize the parties seem to agree that juror No. 34 paused and sighed before answering "Yes" when asked whether this was and is his verdict. We remain mindful that the trial court had the opportunity to hear this juror's response and to observe his demeanor and tone of voice (*Kellogg*, 77 Ill. 2d at 529) but did not discern a need to question him further. We cannot substitute our judgment for the trial court's as to whether juror No. 34 exhibited such a degree of hesitancy during his response as to justify further questioning.

¶ 38     Moreover, plaintiff directs our attention to no case holding that a juror pausing or sighing during polling requires a trial court to continue polling that juror. To the contrary, case law establishes that a juror must either express dissent to the verdict or provide an ambiguous response to require the court to continue polling that juror. See *People v. McDonald*, 168 Ill. 2d 420, 461, 463 (1995) (no additional polling was necessary where a juror said that, "[r]eluctantly," this was and is his verdict at a death sentence hearing); *Cabrera*, 116 Ill. 2d at 489-90 (where a juror answered "Yes" when asked whether this was and is her verdict, there was no need to conduct further polling, even though this juror also attempted to explain herself before being cut off by the trial court); *Ferry v. Checker Taxi Co.*, 165 Ill. App. 3d 744, 748, 753 (1987) (although a juror initially "expressed some doubt as to the verdict" when questioned by defense counsel, because all jurors subsequently told the trial court that this was then and is now their verdict, there was no need for additional polling); *People v. Herron*, 30 Ill. App. 3d 788, 789, 791-92 (1975) (no error in accepting a verdict where one juror responded to the question " 'Was this and is this now your verdict?' " by saying, " 'It wasn't, but it is.' "). As stated in *People v. Hill*, 14 Ill. App. 3d 20, 22 (1973): "We do not see how hesitating before answering 'Yes' can be construed to be an answer

- 17 -

of 'No.' If the hesitation proves anything it is that the juror was careful about her answer." Here, the purpose of polling was satisfied, as the jurors each had an " 'opportunity to disclose any coercion, mistake, or dissention from the verdict announced.' " *Carter*, 2020 IL App (3d) 170745, ¶ 28 (quoting *People v. Williams*, 97 Ill. 2d 252, 308 (1983)).

¶ 39    In arguing that the polling was insufficient, plaintiff relies heavily on the circumstances surrounding the Surrender Note. In his reply brief, plaintiff goes so far as to assert: "The fact the Surrender Note was issued prior to polling should be treated as if one of the jurors had read the contents of the Surrender Note verbatim into the record during polling before stating 'yes.' " However, plaintiff cites no case law indicating that events occurring before the jury reaches a verdict are relevant to a challenge of polling procedures. As we discussed in the preceding section, a juror wrote the Surrender Note before the trial court gave a *Prim* instruction, before the jury reached a verdict, and before the court polled the jury about the verdict. By obtaining affirmative responses from each juror indicating this was then and is now their verdict, the court assured there was no dissent to the verdict and that it was not the product of coercion. That is what the law governing polling requires.

¶ 40    Plaintiff proposes the trial court should have continued its polling to obtain "an affirmative statement or documentation by the author [of the Surrender Note] that he or she reconsidered his or her position and was signing the verdict form for a proper reason in accordance with the author's beliefs and oath as a juror." However, absent a manifestation of dissent or an ambiguous answer during polling, the court reasonably determined that identifying and interrogating the author of the Surrender Note was unnecessary. Again, a court "must be careful not to make the polling process another arena for deliberations." *Kellogg*, 77 Ill. 2d at 529; see *Freeman v. City of Chicago*, 2017 IL App (1st) 153644, ¶¶ 23-28, 75 (finding no abuse of

discretion where (1) the jury returned an initial verdict, (2) a juror indicated during polling that she was under duress and did not want this to be her verdict, (3) the trial court allowed the jury to continue deliberating the next morning, (4) the jury returned a second identical verdict after only five to seven additional minutes of deliberating, (5) all jurors indicated that this was their verdict, and (6) the trial court entered judgment on the second verdict).

¶ 41     The trial court's decision to ask additional questions of the foreperson does not change our analysis. The foreperson signed conflicting verdict forms but crossed her name out on one. The court acted within its discretion by ensuring the foreperson meant to sign a verdict for the defense. The circumstances did not require the court to conduct a broader inquiry of the entire jury to ascertain the author of the Surrender Note.

¶ 42                              C. Jury Instruction

¶ 43     Finally, plaintiff argues the trial court erred by refusing to use the word "misdiagnosed" in an instruction outlining plaintiff's allegations of negligence. According to plaintiff, there was a basis in the evidence to use the word "misdiagnosed." Citing *Willis v. Khatkhate*, 373 Ill. App. 3d 495, 504-05 (2007), plaintiff further submits that failures to "make the ultimate diagnosis" and to "offer proper treatment" inherently constitute a misdiagnosis. Citing one of the jury notes, plaintiff asserts that "the jurors were struggling to understand" the instruction containing the phrase "failed to diagnose."

¶ 44     Defendants respond that the trial court properly used the phrase "failed to diagnose" rather than "misdiagnosed." According to defendants, the verdict for the defense shows the jury determined Dr. Love did not negligently fail to diagnose plaintiff's fractures, which means there is no issue about any misdiagnosis. Defendants submit that plaintiff's point about "misdiagnosed" being synonymous with "failed to diagnose" proves plaintiff suffered no prejudice from the way

the court instructed the jury ("[I]f the terms are interchangeable and the same, it would not have made a difference.").

¶ 45   "[C]ivil litigants are entitled to have the jury instructed on the issues presented, the applicable legal principles, and the facts that must be proved to support a verdict." *Bailey v. Mercy Hospital & Medical Center*, 2021 IL 126748, ¶ 41. " 'While the threshold for permitting an instruction in a civil case is modest, the standard for reversing a judgment based on failure to permit an instruction is high,' " as the trial court has discretion as to which instructions to use. *Bailey*, 2021 IL 126748, ¶ 41 (quoting *Heastie v. Roberts*, 226 Ill. 2d 515, 543 (2007)). When determining whether the court abused its discretion, we consider whether the instructions, taken as a whole, were sufficiently clear, not misleading, and fairly and correctly stated the law. *Bailey*, 2021 IL 126748, ¶ 42. "Ultimately, a reviewing court should grant a new trial only when the trial court's refusal to give a tendered jury instruction results in serious prejudice to the party's right to a fair trial." *Bailey*, 2021 IL 126748, ¶ 42.

¶ 46   We hold that the trial court did not abuse its discretion when instructing the jury. Both versions of the subject instruction plaintiff tendered apparently were derived from Illinois Pattern Jury Instructions, Civil, No. 20.01 (approved Aug. 24, 2023), which identifies the issues in the pleadings and directs courts to "[s]et forth in simple form without undue emphasis or repetition those allegations of the complaint as to the negligence of the defendants which have not been withdrawn or ruled out by the court and are supported by the evidence." (Emphases omitted.) In his complaint, plaintiff alleged Dr. Love "[f]ailed to diagnose" his fractures. The trial evidence was undisputed that Dr. Love never diagnosed fractures, but instead treated plaintiff with antibiotics for cellulitis. Plaintiff's counsel told the court during the discussion on the subject jury instruction that he was "not sure there was ever confirmation or not about" the cellulitis and that

he was "just referencing the misdiagnosis of the broken bones." Given that plaintiff's counsel conceded it was unknown whether plaintiff had cellulitis when he saw Dr. Love, the word "misdiagnosed" had the potential to mislead or confuse the jury, inviting the jury to focus on whether plaintiff had cellulitis when the real dispute was whether Dr. Love was negligent for missing the fractures. The court also appropriately recognized that part of plaintiff's counsel's basis for wanting to use the word "misdiagnosed" was that plaintiff's surgeon, who was not a standard-of-care expert, used that word. Furthermore, plaintiff's reliance on *Willis* does not convince us that the court abused its discretion under the circumstances presented. The appellate court in *Willis* addressed a question regarding tort immunity, not a discretionary ruling on a jury instruction.

¶ 47 Plaintiff has also failed to demonstrate prejudice from the way the trial court instructed the jury. His assertion that the jury struggled to understand the subject instruction is unfounded, as the jury never asked any question specifically about the phrase "failed to diagnose." Moreover, if plaintiff is correct that failure to diagnose is inherently a misdiagnosis, then he suffered no prejudice from the court using a synonymic phrase. We further note that during closing argument, plaintiff's counsel asserted the jury could decide what it meant and whether it was important that plaintiff's surgeon used the word "misdiagnosed" in her medical records. Thus, despite the court's ruling regarding the subject jury instruction, plaintiff got his point across to the jury that he believed Dr. Love misdiagnosed him.

¶ 48 III. CONCLUSION

¶ 49 For the reasons stated, we affirm the trial court's judgment.

¶ 50 Affirmed.