In the

# United States Court of Appeals

## For the Seventh Circuit

No. 15-1194

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

LEMUREL E. WILLIAMS,

*Defendant-Appellant.*

Appeal from the United States District Court for the
Eastern District of Wisconsin.
No. 2:14-cr-00159 — **J.P. Stadtmueller**, *Judge.*

ARGUED SEPTEMBER 22, 2015 — DECIDED APRIL 26, 2016

Before FLAUM, WILLIAMS, and HAMILTON, *Circuit Judges.*

WILLIAMS, *Circuit Judge.* Lemurel Williams was convicted of being a felon in possession of a gun. Williams's first argument on appeal is that the prosecution unconstitutionally rejected potential jurors because of their race. We need not decide that issue because we agree with Williams's *second* argument: a new trial is needed because the totality of the

circumstances regarding the jury's verdict was impermissibly coercive.

## I. BACKGROUND

Milwaukee police officers saw Williams walking in the middle of the road and talking on a cell phone at 1:30 in the morning. When they asked him to stop, he fled, running through a yard and jumping over two fences. He was caught and his cell phone and a gun were recovered near the fences he had leaped. He was tried and convicted for knowingly possessing a gun despite his prior felony conviction. *See* 18 U.S.C. §§ 922(g)(1), 924(a)(2).

### A. Potential Race Discrimination In Jury Selection

During jury selection, the prosecution used peremptory strikes against two African-American potential jurors. After the jury was sworn, defense counsel challenged the prosecution's strikes as unconstitutional race discrimination. The prosecution gave race-neutral explanations for its strikes, but it did so eleven days later (rather than promptly), in writing (rather than orally), and in secret (rather than sharing its reasons with the defense). The judge accepted the proffered reasons and rejected the defense's challenge. Williams challenges that decision on appeal.

### B. Potential Juror Coercion During Deliberation

After three hours of deliberating, the jury returned a guilty verdict, which was read aloud in court. At defense counsel's request, the jury was polled—that is, jurors were individually asked, "Was this and is this your verdict with regard to the defendant, Lemurel E. Williams?" Juror 1 responded "no." It seems the judge did not hear that response because the polling continued, and when all other jurors re-

sponded "yes," the judge dismissed the jury as if the case was over. Before the jurors left, defense counsel asked for a sidebar. After the sidebar, the jurors were re-polled.

Again, Juror 1 rejected the guilty verdict and all other jurors affirmed it. Without taking a break or discussing the situation with the lawyers, the judge gave the following instruction:

> Members of the jury, based upon the repoll of the jury, I'm going to instruct you to return to your jury room and renew your deliberations since it is necessary that each juror agree, that is, your verdict must be unanimous.
>
> The court security officer will return the jury to the jury deliberation room, and a new verdict form will be prepared; and they will be instructed to continue with their deliberations until they have reached a unanimous verdict.

Ten minutes later, the jury sent the judge a note. The top of the note read, "We apologize, we misunderstood the question that was presented to each juror." That portion was signed by a juror (not Juror 1). The bottom of the note read, "We have the verdict." That portion was signed by a different juror (again, not Juror 1).

The jury returned to the courtroom and the judge explained that he learned "through word from Mr. Baumann, the bailiff, that the juror who indicated that the verdict was not her verdict had misunderstood" the poll question. The judge continued, "So before we proceed further, Ms. Harris, Juror Number 1, do I have it right that you misunderstood [the question], and the verdict that was read was and is your

verdict?" Juror 1 responded, "Yes, I misunderstood the question." At that point, neither a new verdict nor the prior verdict was read aloud. The jurors were, however, polled about the verdict that had been read earlier, and they all said that the earlier verdict was their individual verdict. The judge stated that "the misunderstanding has been cleared" and dismissed the jury. Williams argues that he was denied a fair trial because Juror 1 was coerced into joining the guilty verdict.

## II. ANALYSIS

### A. *Batson* Jury Selection Process

Williams argues that the prosecution violated the rule of *Batson v. Kentucky*, 476 U.S. 79 (1986), which prohibits striking potential jurors because of their race. The *Batson* rule is an important one that protects not only the particular criminal defendant, but also potential jurors, the wider community, and our system of justice. *See J.E.B. v. Ala. ex rel. T.B.*, 511 U.S. 127, 140 (1994); *Powers v. Ohio*, 499 U.S. 400, 405–07, 411 (1991); *Winston v. Boatwright*, 649 F.3d 618, 622, 626 (7th Cir. 2011).

The government asks us to hold that a *Batson* challenge is untimely if made after the venire is dismissed and the jury is sworn (as in this case). That rule is sensible; the dismissal of the venire or the swearing of the jury is the presumptive deadline for making *Batson* challenges. It is the district judge's responsibility to ensure that parties have a fair opportunity to raise such challenges; we will not treat a challenge as forfeited if the opportunity to object was lacking. District judges must ensure that the timing and sequence of exercising strikes, excusing the venire, swearing in jurors,

and beginning the trial do not preclude timely *Batson* challenges. To permit reasoned challenges—and avoid unreasoned ones—a break could be taken after strikes are exercised, giving the attorneys time to analyze the strikes. Before excusing the venire, the judge could explicitly ask the parties whether they have any *Batson* challenges. We are sure that acceptable alternatives exist, so we lay down no mandatory procedures, but we remind judges to think carefully about the process.

Judges do not bear the responsibility alone—parties must pay attention to process. If a *Batson* challenge is untimely, it may do little good to complain on appeal that the untimeliness resulted from the judge's jury-selection process, for which the parties bear no fault. Fault aside, the lack of a timely challenge might render the record inadequate for a probing appellate review. *Cf. United States v. Willis*, 523 F.3d 762, 767 (7th Cir. 2008). So if the process does not permit timely challenges, parties should object to the process itself.

Next, if a peremptory strike is challenged and the striking party proffers a race-neutral explanation, the manner in which the explanation is given is important. "*Batson* and its progeny direct trial judges to assess the honesty—not the accuracy—of a proffered race-neutral explanation." *United States v. Stephens*, 514 F.3d 703, 711 (7th Cir. 2008). And "the best evidence of the intent of the attorney exercising a strike is often that attorney's demeanor." *Thaler v. Hayes*, 559 U.S. 43, 49 (2010) (quoting *Snyder v. Louisiana*, 552 U.S. 472, 477 (2008); *Hernandez v. New York*, 500 U.S. 352, 365 (1991)). So race-neutral explanations should be given in a way that lets the judge observe the attorney's demeanor and assess his or her honesty. The process used here—receiving the explana-

tions in writing (instead of orally) and eleven days after the strike (instead of promptly)—was flawed.

Also troubling is that the district judge accepted the government's explanations in secret. There was no reason for that. The government's reasons were given after trial concluded, so there was no risk of disclosing strategy. Even in a more typical case, secret explanations are strongly discouraged. While we have held that secret proceedings do not *necessarily* violate the Constitution, we stressed that they should be the exception—"an adversarial procedure" should be used "whenever possible." *United States v. Tucker*, 836 F.2d 334, 340 (7th Cir. 1988).[1]

The procedures used by the district court for evaluating the *Batson* challenge were problematic. Nonetheless, we do not reach the merits of the issue because, as discussed next, Williams is entitled to a new trial on separate grounds.

## B. Circumstances Surrounding Jury Verdict Were Impermissibly Coercive

### a. Legal Standard and Standard of Review

"Any criminal defendant … being tried by a jury is entitled to the uncoerced verdict of that body." *Lowenfield v. Phelps*, 484 U.S. 231, 241 (1988). Coercion occurs when jurors "surrender their honest opinions for the mere purpose of returning a verdict." *United States v. Blitch*, 622 F.3d 658, 668 (7th Cir. 2010). To evaluate potential coercion we look at the

---

[1] In *Davis v. Ayala*, 135 S. Ct. 2187 (2015), the majority assumed, and the dissent would have held, that it violates the Constitution to keep race-neutral explanations secret from the other side. *Id*. at 2197, 2210–11. Given the procedural posture, the case did not lead to a relevant holding.

totality of the circumstances. *Lowenfield*, 484 U.S. at 250; *Blitch*, 622 F.3d at 669–70. We focus on the situation facing the juror, not the intent of the party or the judge whose actions created that situation. *Blitch*, 622 F.3d at 668; *see also Leake v. United States*, 77 A.3d 971, 975 (D.C. 2013) ("An inquiry into jury verdict coercion is made from the perspective of the jurors."). We cannot know for certain whether Juror 1 favored conviction all along and merely misunderstood the poll question, in which case she was not coerced. She was not asked to explain *how* she misunderstood the question. We have no quarrel with that, given the sometimes unclear line between asking jurors whether the verdict form contains a mistake and improperly asking about the deliberative processes. *See generally* Fed. R. Evid. 606(b); *United States v. DiDomenico*, 78 F.3d 294, 302 (7th Cir. 1996). But to analyze whether the circumstances were impermissibly coercive, we consider the possibility that Juror 1 understood the poll question correctly and still rejected the verdict. *See Brown v. United States*, 59 A.3d 967, 976 (D.C. 2013) (the "evaluation of jury coercion focuses on probabilities, not certainties").

Williams moved for a mistrial on the ground of jury coercion, and that motion was denied. We review the denial of a motion for a mistrial for an abuse of discretion. *United States v. Mannie*, 509 F.3d 851, 856 (7th Cir. 2007). But there is more to the standard of review in this case. Although we evaluate potential coercion by looking at the totality of the circumstances, the government argues that some of those circumstances should receive less scrutiny because Williams failed to object at trial.

In particular, the government argues that the judge's supplemental jury instruction should be reviewed only for

plain error because Williams did not immediately object. While the failure to object often results in plain-error review, the circumstances of this case do not fit the mold. Specifically: (1) the judge gave the instruction without consulting counsel, so they did not know what he would say; (2) then, without hearing from or addressing counsel, the judge immediately recessed to attend to a civil trial over which he was simultaneously presiding; and (3) the defense moved for a mistrial as soon as court resumed, but the jury had already reached its verdict. In short, we cannot confidently say that there was an opportunity to object and fix any error. *Cf. United States v. Speed*, 811 F.3d 854, 858–59 (7th Cir. 2016) (plain-error review inappropriate if the defendant lacked an adequate opportunity to object).

In contrast, the plain-error standard is appropriate for our review of the jury polls because Williams did not object, and there is no indication that he lacked an opportunity to do so. Under the plain-error standard, we ask whether the error was "obvious." *United States v. Haldar*, 751 F.3d 450, 456 (7th Cir. 2014). The plain-error inquiry also asks whether the error "affected the defendant's substantial rights" and "seriously affected the fairness, integrity, or public reputation of the judicial proceedings." *Id*. But our overall inquiry—whether there was too great a risk of juror coercion—looks at the "totality of the circumstances," and most of the circumstances here are not subject to plain-error review. So we do not address the last two aspects of the plain-error standard independently as to the jury polls alone. We note that if the totality of the circumstances presented too great a risk of juror coercion, then Williams's rights and the fairness, integrity, and reputation of the judicial proceedings were affected.

### b. Analysis

We begin with the polls. Long ago, the Supreme Court held that it is always reversible error to ask a divided jury to reveal its numerical division (e.g., ten jurors on one side and two on the other). *Brasfield v. United States*, 272 U.S. 448 (1926). But polling a jury that is believed to be unanimous is different—a poll rarely reveals division; its purpose and usual effect is to confirm unanimity. *See, e.g.*, *Lyell v. Renico*, 470 F.3d 1177, 1184 (6th Cir. 2006) (emphasizing the difference between a post-verdict poll and an inquiry made to a jury known to be divided). It is true that polling always risks revealing the jury's precise division (because the final juror could reject the verdict after all others affirm it), but criminal defendants are *entitled* to a poll, Fed. R. Crim. P. 31(d), and Williams's lawyer asked for one. So Williams cannot complain about the mere fact that a poll was conducted. That said, the manner in which a poll is conducted matters, and the polling in this case risked more coercion than necessary.

Once Juror 1 rejected the verdict, the verdict could not stand; polling the remaining jurors was pointless. *See, e.g.*, *Lyell*, 470 F.3d at 1183 (noting that, after the third-to-last juror rejected the verdict, there was "little point to continuing to poll the last two jurors"). Williams argues that it was worse than pointless, it was coercive because it needlessly revealed that Juror 1 was the lone dissenter, putting pressure on her to switch her vote.

In *United States v. Carraway*, 108 F.3d 745 (7th Cir. 1997), defendant John Carraway was tried jointly with four co-defendants. The jury returned a guilty verdict as to all five defendants. When polled, the seventh juror affirmed the verdict as to the other defendants but rejected it as to Carra-

way. *Id*. at 750. After conferring with the lawyers, the judge resumed polling, but only as to the other defendants—no subsequent juror was asked about Carraway. *Id*. After continued deliberations, the jury unanimously found Carraway guilty. *Id*. at 751. On appeal, Carraway argued that the continued polling was coercive. Rejecting that argument, we noted that "[t]he weight of authority suggests that when the trial judge continues to poll the jury after one juror disagrees with the verdict, reversible error occurs only when it is apparent that the judge coerced the jurors into prematurely rendering a decision and not merely because the judge continued to poll the jury." *Id*. at 751.[2] In comments that sharply distinguish *Carraway* from the present case, we noted that:

> Carraway points to no evidence of coercion
> other than the court's decision to resume poll-
> ing. In that regard, we note that when Judge
> Stiehl decided to resume polling of the other
> five jurors, he wisely had them asked solely
> about the verdicts against the other four de-
> fendants, not Carraway. His decision to pro-
> ceed in that fashion averted further disclosure

---

[2] That is the rule in six circuits. *United States v. Penniegraft*, 641 F.3d 566, 579–80 (4th Cir. 2011); *Lyell v. Renico*, 470 F.3d 1177 (6th Cir. 2006); *United States v. Gambino*, 951 F.2d 498, 502 (2d Cir. 1991); *United States v. Fiorilla*, 850 F.2d 172, 176 (3d Cir. 1988); *Amos v. United States*, 496 F.2d 1269, 1272–73 (8th Cir. 1974); *United States v. Brooks*, 420 F.2d 1350, 1353 (D.C. Cir. 1969). The Eleventh Circuit holds that continued polling is "per se error" under *Brasfield* because it reveals the numerical division of the jury "for no reason at all." *United States v. Spitz*, 696 F.2d 916 (11th Cir. 1983). As discussed below, this case involves coercive circumstances beyond polling alone, so we need not decide whether a bright-line rule, as in *Spitz*, should apply in this circuit.

as to the numerical division of the jury (see [*Brasfield*]), and relieved the objecting juror of any additional pressure that she might have experienced had further polling as to Carraway confirmed in open court that she was the lone dissenter. *Id*. at 751.

Had the judge here followed the "wise" approach described in *Carraway*—that is, had he stopped polling once Juror 1 rejected the verdict—the likelihood of coercion would have been far less substantial.[3] Instead, he polled the entire jury, revealing its precise division and putting pressure on Juror 1 as the publicly known lone dissenter. We are confident that the judge did not *intend* to pressure anyone (it appears he did not hear Juror 1's response), but the judge's intentions are not at issue. *Blitch*, 622 F.3d at 668. Indeed, the judge's innocent failure to hear Juror 1 led to *additional* coercive actions: dismissing the jury (which could convey that the judge was eager to end the case[4]) and publicly polling the entire jury a *second* time. *See Lowenfield*, 484 U.S. at 251 ("The court here polled the jury not once, but twice, increasing whatever coercive effect a single poll would have had.") (Marshall, J., dissenting). So the manner of polling risked coercion to a greater extent than necessary. Given that the continued polling served no purpose at all, departed from the

---

[3] Other courts have followed the "wise" approach, terminating a poll as soon as a lack of unanimity was revealed. *E.g.*, *United States v. Thomas*, 791 F.3d 889, 897–90 (8th Cir. 2015); *Leake*, 77 A.3d at 976; *United States v. Carrasquilla-Lombada*, No. 8:14-cr-394, 2015 U.S. Dist. LEXIS 48258, at *7–8 (M.D. Fla. Apr. 13, 2015).

[4] A juror might have thought the judge was eager to end the case because the jurors knew the judge was simultaneously presiding over a civil trial.

approach we approved in *Carraway*, and happened twice, the error was "plain" and "obvious."

Immediately after Juror 1 twice rejected the verdict, the judge instructed the jurors "to continue with their deliberations until they have reached a unanimous verdict." Standing alone, that instruction might be viewed as less coercive than "You have got to reach a decision in this case," an instruction that the Supreme Court held was overly coercive. *Jenkins v. United States*, 380 U.S. 445, 446 (1965). But we must look at the totality of the circumstances, including the fact that the instruction came at a very sensitive moment—immediately after Juror 1 was identified as the lone dissenter. *See Blitch*, 622 F.3d at 670 ("At the time of that direction, apparently only a single vote stood between the defendants and conviction, and care was especially important.").

In *Lowenfield v. Phelps*, the Supreme Court analyzed a particular combination of a jury poll and subsequent instruction. In that case, when the jury had trouble reaching a verdict, the judge asked each juror whether he or she thought that further deliberations would be helpful. Eleven said yes and one said no. 484 U.S. at 234–35. The judge told the jurors to continue deliberating, and gave the following instruction:

> When you enter the jury room it is your duty to consult with one another to consider each other's views and to discuss the evidence with the objective of reaching a just verdict if you can do so without violence to that individual judgment.
>
> Each of you must decide the case for yourself but only after discussion and impartial consid-

eration of the case with your fellow jurors. You are not advocates for one side or the other. Do not hesitate to reexamine your own views and to change your opinion if you are convinced you are wrong but do not surrender your honest belief as to the weight and effect of evidence solely because of the opinion of your fellow jurors or for the mere purpose of returning a verdict. *Id*. at 235.

The Supreme Court noted that some "combinations of supplemental charges and polling" could be coercive, but held that the particular combination in *Lowenfield* was not. *Id*. at 241. The Court relied in part on the fact that the jury's division was revealed "not as to how they stood on the merits of the verdict, but how they stood on the question of whether further deliberations might assist them in returning a verdict." *Id*. at 240. That is not the case here.

Moreover, important to *Lowenfield*'s holding was the fact that the neutrally worded instruction was a far cry from the coercive mandate from *Jenkins* ("You have got to reach a decision in this case."). *Lowenfield*, 484 U.S. at 239. Indeed, the *Lowenfield* instruction bears a striking resemblance to the *Silvern* instruction—the instruction given in this circuit when a jury is deadlocked. The *Silvern* instruction tells jurors that they should "make every reasonable effort" to reach the "goal" of a unanimous verdict, but that they "should not surrender [their] honest beliefs about the weight or effect of evidence just because of the opinions of [their] fellow jurors or just so that there can be a unanimous verdict." *Pattern Criminal Jury Instructions of the Seventh Circuit* 7.03 (2012) (citing *United States v. Silvern*, 484 F.2d 879, 883 (7th Cir. 1973)

(en banc)). The comment to the pattern instruction suggests *exclusively* giving this instruction "to avoid inadvertently coercive substitutes."

The government is right that the *Silvern* instruction is not *required* unless the jury is deadlocked. *Willis*, 523 F.3d at 775. But where a district judge instructs a divided jury, a comparison between the *Silvern* instruction and the instruction given can inform our analysis of potential coercion. *See United States v. Fouse*, 578 F.3d 643, 652 (7th Cir. 2009) ("If a district court deviates from the [*Silvern*] instruction[], we will reverse if the ultimate instruction given was 'coercive of unanimity.'"). A comparison here is revealing. The *Silvern* and *Lowenfield* instructions state that a unanimous verdict is the goal, but they also remind jurors not to surrender their honest beliefs just to achieve that goal. In contrast, the judge here said nothing to the jurors about preserving their honest beliefs. So while we do not hold that the *Silvern* instruction was *required*, a totality-of-the-circumstances analysis cannot ignore that the well-known *Silvern* instruction would have been less coercive than the instruction given here. *See Brown*, 59 A.3d at 977 (holding that when an "atmosphere of coercion exists," the judge *must* give an instruction that reminds jurors not to surrender their honest beliefs).

Just ten minutes after the judge's instruction, the jury sent a note saying "we" misunderstood the polling question and "we" have a unanimous verdict. Strangely, the note was signed by two jurors but not by Juror 1 (even though only Juror 1 had rejected the prior verdict). Also strange is an unexplained "misunderstanding" in a case that did not involve multiple defendants, multiple counts, or any possibility of an inconsistent verdict. We have stated that a supplemental

instruction is less likely to have been coercive when the jury deliberated for a long time after receiving the instruction before returning a verdict. *E.g.*, *United States v. De Stefano*, 476 F.2d 324, 337 (7th Cir. 1973); *United States v. Bambulas*, 471 F.2d 501, 506 (7th Cir. 1972). Conversely, it is somewhat more likely that a potentially coercive instruction was in fact coercive when the jury returns a verdict very quickly after receiving the instruction. *See Lowenfield*, 484 U.S. at 240 ("We are mindful that the jury returned with its verdict soon after receiving the supplemental instruction, and that this suggests the possibility of coercion."); *Smith v. Curry*, 580 F.3d 1071, 1083–84 (9th Cir. 2009); *United States v. Yarborough*, 400 F.3d 17, 22 (D.C. Cir. 2005); *United States v. Webb*, 816 F.2d 1263, 1267 (8th Cir. 1987).

Finally, when the jury returned to the courtroom, the judge stated in open court that he had "learned" that *Juror 1 specifically* had misunderstood the polling question (even though that is not what the jury's note says). He then publicly identified Juror 1 by name and asked, "Ms. Harris, Juror Number 1, *do I have it right* that you misunderstood [the question], and the verdict that was read was and is your verdict?" (emphasis added). To reject the verdict, Juror 1 would have had to tell the presiding federal judge that *he* was wrong—no easy task for a juror, especially one already enduring coercive circumstances.

We reiterate that we are confident the judge did not intend to coerce anyone. But the focus is on the juror and we hold that the totality of the circumstances—the combination of the polls, the fact of a lone dissenter, the instruction, the content and timing of the jury's note, and the form of the judge's direct question—was impermissibly coercive, even if

none of those circumstances standing alone would have been. So the judgment cannot stand.

### III. CONCLUSION

We REVERSE the judgment of the district court and REMAND for a new trial.