**2026 IL 131411**

# IN THE

# SUPREME COURT

# OF

# THE STATE OF ILLINOIS

(Docket No. 131411)

ROBERT L. SCHILLING, Appellant, v. QUINCY PHYSICIANS AND SURGEONS CLINIC, S.C., d/b/a Quincy Medical Group, *et al.*, Appellees.

*Opinion filed January 23, 2026.*

JUSTICE ROCHFORD delivered the judgment of the court, with opinion.

Chief Justice Neville and Justices Theis, Overstreet, Holder White, Cunningham, and O'Brien concurred in the judgment and opinion.

**OPINION**

¶ 1     Plaintiff, Robert Schilling, filed a two-count medical malpractice complaint against defendants, Kreg J. Love, D.O., and his employer, Quincy Physicians & Surgeons Clinic, S.C., doing business as Quincy Medical Group (QMC). Following a jury trial in the circuit court of Adams County, a verdict was returned in favor of defendants. Plaintiff appealed, arguing that the trial court abused its discretion in

failing to declare a mistrial following receipt of a note from one of the jurors and that the trial court abused its discretion in its polling of the jury. The Appellate Court, Fourth District, affirmed the trial court. 2024 IL App (4th) 240520-U. For the following reasons we affirm the appellate court.

¶ 2                                    BACKGROUND

¶ 3        Because the issues in this case are limited to the jury's deliberations and verdict, we will focus on the facts relevant to those issues and briefly summarize the remaining facts of the case. Plaintiff's medical malpractice complaint alleged that he was a type 1 diabetic and had previously received medical care and treatment from defendants related to his diabetes. On January 12, 2017, plaintiff went to defendant QMC and was examined by defendant Dr. Love. On that date, plaintiff complained that he had difficulty walking on his left foot, explaining that the pain began a week prior when he injured his left ankle and foot. Dr. Love diagnosed plaintiff with left foot edema and potential cellulitis. Plaintiff returned to QMC on January 16, 2017, complaining of increased redness and swelling into his ankles and lower extremities with increased pain in and along the bottom of his foot. Dr. Love again diagnosed cellulitis in the foot and prescribed an antibiotic. Plaintiff telephoned defendants on January 23 and 25, 2017, stating that the swelling in his foot had worsened, the bottom of his foot was a deeper red, and the pain was excruciating. Plaintiff was prescribed additional pain medication. Plaintiff saw Dr. Love again on January 26, 2017, and reported that it was painful to walk and that he was unable to put pressure on the upper part of his foot. Dr. Love repeated his diagnosis of cellulitis and ordered five days of antibiotics for plaintiff. Dr. Love also referred plaintiff to a podiatrist for a follow up.

¶ 4        Plaintiff went to a podiatrist on January 30, 2017, and described his ongoing symptoms. The podiatrist ordered X-rays of the foot. Those X-rays showed a complete dislocated fracture of the first metatarsal and minimally displaced complete transverse fractures of the base of the second and third metatarsals. Plaintiff then was referred to an orthopedic surgeon. The orthopedic surgeon stated that plaintiff's injury was exacerbated when plaintiff continued working and walking on his foot. Plaintiff had surgery on his foot in March 2017. Plaintiff later

developed an infection and had a second surgery in October 2017. Plaintiff ultimately had his left leg amputated just below the knee.

¶ 5    Plaintiff's complaint alleged that Dr. Love had misdiagnosed a fracture in plaintiff's foot as an infection. As a result of the misdiagnosis, plaintiff continued walking on his foot, causing a cascade of fractures that ultimately led to an amputation below his knee.

¶ 6    Plaintiff's case proceeded to a jury trial, which began on October 23, 2023. Following six days of testimony, which included testimony from several expert witnesses as well as Dr. Love, the jury began its deliberations at 2:25 p.m. on November 1, 2023. At 5:10 p.m., the jury sent a note asking, "[a]re we to read and interpret these questions [(Jury Instruction 11)] as they are written or as we perceive the evidence?" The parties agreed that the trial court should respond that what was written in the jury instructions was the law and that the jury's job was to determine the facts and apply those facts to the law as written in the jury instructions. At 6:22 p.m., the jury sent another note with two more questions. The jury asked if negligence and the standard of care are the same. The jury also asked for the legal definition of negligence. The parties agreed that the trial court should respond that the terms were defined in the instructions received by the jury.

¶ 7    At 7 p.m., the jury sent another note to the trial court stating, "it is obvious that we will not come to an agreement unanimously. Sitting in here for hours and hours will not make a difference." The parties agreed that the trial court should respond, "Please continue your deliberations. We will check back in with you shortly." The jury was brought back into the courtroom at 7:55 p.m. and was released until the following day at 9 a.m.

¶ 8    The jury resumed its deliberations at 9:02 a.m. the next morning. At approximately 9:40 a.m., the court informed the attorneys that it had received a note from an unidentified juror. The note, which the parties refer to as the "Surrender Note," stated:

> "For the record, I will sign the verdict for the defendant Dr. Love. I am firm in my support for the plaintiff Mr. Shilling [*sic*].

I am only signing to end this deliberation and put an end to this. After many hours of discussion and debate, we cannot come to a unanimous decision. Therefore, its [*sic*] my position to sign *only* to end this.

I 100% believe Dr. Love was negligent in providing the appropriate care to his patient. As a result, Mr. Schilling [*sic*] overall care was impacted because of Dr. Loves decision.

Once again. I am *only* agreeing to sign to end this." (Emphases in original.)

¶ 9 Plaintiff's counsel argued that the juror's note indicated the jury was deadlocked and moved for a mistrial. Defense counsel responded that, if the jury was deadlocked, a supplemental *Prim* instruction (see *People v. Prim*, 53 Ill. 2d 62 (1972)) was mandated. The *Prim* instruction is set forth in Illinois Pattern Jury Instructions, Civil, No. 1.05 (approved Dec. 8, 2011) (hereinafter IPI Civil No. 1.05). Plaintiff's counsel replied that any further instruction from the court would not cure the juror's clear, unambiguous statements in the Surrender Note and again reiterated that the Surrender Note was grounds for a mistrial. The trial court denied plaintiff's motion for a mistrial, stating that the proper procedure was to ascertain whether the jury was deadlocked and, if so, to give the *Prim* instruction. The trial court then brought the jurors back into the courtroom and asked the foreperson if he felt the jury was deadlocked. The foreperson answered that, to his "understanding," the jury was deadlocked. The trial court then gave the jury IPI Civil No. 1.05, both orally and in writing. That instruction provides:

"The verdict must represent the considered judgment of each juror. In order to return a verdict, it is necessary that each juror agree to it. Your verdict must be unanimous.

It is your duty, as jurors, to consult with one another and to deliberate with a view to reaching an agreement, if you can do so without violence to individual judgment. Each of you must decide the case for yourself, but do so only after an impartial consideration of the evidence with your fellow jurors. In the course of your deliberations, do not hesitate to re-examine your own views and change your opinion if convinced it is erroneous. But, do not surrender your honest conviction as to the weight or effect of evidence solely because of the opinion of your fellow jurors or for the mere purpose of returning a verdict.

- 4 -

You are not partisans. You are judges—judges of the facts. Your sole interest is to ascertain the truth from the evidence in the case." IPI Civil No. 1.05.

¶ 10    Following receipt of the *Prim* instruction, the jury resumed deliberations at approximately 10:10 a.m. At 10:20 a.m., the jury sent another note to the trial court stating:

> "Please provide clarification of the phrase 'deviation from standard of care' and 'professional negligence.'
>
> Is this to be interpreted as 'neglect'? WE NEED A CLEAR INTERPRETATION!
>
> What exhibit is Dr[.] Honnakers [*sic*] deposition? Would like to review[.]"

The parties agreed that the trial court would respond to the jury that the definitions were contained within the jury instructions. The parties also noted that Dr. Honaker's deposition was not included in the exhibits given to the jurors and agreed that the jurors would be told that the exhibits for their review were in their possession.

¶ 11    At this point, plaintiff's counsel again moved for a mistrial based upon the Surrender Note. Plaintiff's counsel argued that the *Prim* instruction was untimely and should have been given the previous night when the jury first declared that it was deadlocked. Defense counsel responded that plaintiff's counsel had the opportunity to request a *Prim* instruction the night before and did not, thereby waiving any claim that the *Prim* instruction was untimely. Defense counsel also argued that a mistrial was not warranted. The trial court denied the motion for a mistrial.

¶ 12    At 11 a.m., the jury informed the trial court that it had reached a verdict. Plaintiff's counsel moved the court to poll the jury when the jurors returned to the courtroom, before the verdict was announced. The trial court responded that it would poll the jurors but would do so after the verdict was announced. The trial court stated that if each juror orally confirmed the verdict, the jurors would be discharged without further inquiry. If a juror dissented from the verdict, the other jurors would be discharged, and the dissenting juror would be questioned further.

¶ 13    The jurors were then brought back into the courtroom, and the verdict in favor of defendants was read. Each juror was then asked, "was this then and is this now your verdict?" All jurors answered "yes" to the polling question, at which point the jury was discharged.

¶ 14    Plaintiff's counsel then renewed his request for a mistrial. Plaintiff's counsel noted on the record that when juror 34 was polled, the juror hesitated and gave a loud sigh but answered "yes" when asked if the verdict was then and is now his verdict. Plaintiff's counsel suggested that juror 34 may have been the juror who wrote the Surrender Note and argued that there should have been further polling of that juror given his response during the individual polling. The trial court again denied plaintiff's motion for mistrial.

¶ 15    Plaintiff subsequently filed a posttrial motion for a new trial, arguing that a mistrial should have been declared as soon as the trial court received the Surrender Note. Plaintiff asserted that the error created by the Surrender Note could not be cured by the *Prim* instruction. Plaintiff also argued that juror 34's hesitation and sigh during the polling of the jury required further questioning of that juror. Finally, plaintiff argued that the trial court erred in instructing the jury that defendant Dr. Love "failed to diagnose" plaintiff's fractures rather than instructing the jury that Dr. Love "misdiagnosed" plaintiff's fracture. Following briefing and argument, the trial court denied plaintiff's motion for a new trial.

¶ 16    Plaintiff appealed, and the Appellate Court, Second District, affirmed the trial court. 2024 IL App (4th) 240520-U. Plaintiff again argued that the trial court erred in failing to declare a mistrial upon receiving the Surrender Note. Plaintiff claimed that (1) he was deprived of his right to a unanimous jury verdict because the Surrender Note showed that a juror disagreed with the verdict and voted with the majority simply to end deliberations, (2) the Surrender Note was evidence of juror misconduct, (3) in light of the Surrender Note, the *Prim* instruction was inherently coercive because the jury was already deadlocked, and (4) the verdict was an improper " 'compromise verdict.' " *Id.* ¶ 18.

¶ 17    The appellate court concluded that the trial court did not abuse its discretion in denying plaintiff's motions for a mistrial. *Id.* ¶ 23. The appellate court stated that it was not unexpected that the jury had failed to reach a consensus within the first five or six hours of deliberations, given the length and complexity of the trial. *Id.* ¶ 27.

In addition, the appellate court found it significant that the jury had not been given a *Prim* instruction before the trial court received the Surrender Note. *Id.* The appellate court also rejected plaintiff's claim that the *Prim* instruction was coercive, pointing out that this court had adopted the *Prim* instruction specifically to avoid the possibility of undue coercion. *Id.* ¶ 28. Accordingly, the trial court acted within its discretion by giving the *Prim* instruction rather than declaring a mistrial upon receiving the Surrender Note. *Id.* ¶ 29.

¶ 18   The appellate court next found that the trial court did not abuse its discretion in refusing to poll the jury beyond asking "whether this was then and is this now [your] verdict?" *Id.* ¶ 37. The appellate court stated that a trial court is required to continue polling a juror where that juror either expresses dissent to the verdict or provides an ambiguous response to the polling question. *Id.* ¶ 38. In this case, none of the jurors responded to the trial court's polling question with an ambiguous answer or by manifesting dissent to the verdict, and plaintiff had cited no case holding that a trial court is required to continue polling a juror if the juror paused or sighed during polling. *Id.*

¶ 19   Finally, the appellate court held that the trial court did not abuse its discretion when it used the phrase " '[f]ailed to diagnose" rather than " 'misdiagnosed' " in a jury instruction. *Id.* ¶ 46.

¶ 20   This court subsequently allowed plaintiff's petition for leave to appeal to this court. Ill. S. Ct. R. 315(a) (eff. Dec. 7, 2023). We also allowed the Illinois Trial Lawyer's Association leave to file an *amicus curiae* brief in support of plaintiff's position. Ill. S. Ct. R. 345 (eff. Sept. 20, 2010).

¶ 21                                    ANALYSIS

¶ 22   In this court, plaintiff again argues that the trial court erred both in denying his motion for a mistrial following receipt of the Surrender Note and in denying plaintiff's request for additional polling of the jury. Plaintiff does not appeal the lower courts' ruling concerning the jury instruction.

¶ 23   We first address plaintiff's claim that the trial court abused its discretion in denying his motion for a mistrial upon receipt of the Surrender Note. A trial court

may declare a mistrial and discharge a jury when it is apparent that the jury is hopelessly deadlocked. *People v. Cole*, 91 Ill. 2d 172, 175 (1992). The trial court's decision whether to declare a mistrial when a jury is deadlocked is " 'accorded great deference by a reviewing court.' " *People v. Kimble*, 2019 IL 122830, ¶ 36 (quoting *Arizona v. Washington*, 434 U.S. 497, 510 (1978)). Accordingly, this court applies an abuse of discretion standard in reviewing a trial court's denial of a party's motion for a mistrial. *People v. Bishop*, 218 Ill. 2d 232, 251 (2006). An abuse of discretion occurs only when no reasonable person would adopt the view of the trial court or when the trial court's ruling is arbitrary or fanciful. *Brown v. Illinois State Police*, 2021 IL 126153, ¶ 49. This court will not second-guess a trial court or substitute our judgment for that of the trial court. *Kimble*, 2019 IL 122830, ¶ 46. Nor will this court reweigh the evidence, as a "discretionary decision implies a range of acceptable outcomes." *Id.*

¶ 24      Plaintiff first argues that the trial court should have granted his motion for a mistrial because the Surrender Note constituted juror misconduct. Plaintiff maintains that the Surrender Note evidenced the author's unwillingness to continue deliberations or to deliberate in good faith. Plaintiff characterizes the Surrender Note as a promise, guarantee, or assurance that he or she would return a verdict based on a manifestly improper reason.

¶ 25      Plaintiff's argument suggests that there is only one reasonable interpretation of the Surrender Note. As the appellate court found, however, there is another reasonable interpretation of the Surrender Note. The appellate court stated:

> "[a] different reasonable interpretation is that the author simply wanted to get the court's attention about the perceived deadlock, especially considering the court did not provide any guidance when the jury first declared itself deadlocked the previous night. Significantly, after approximately six hours of deliberations, the jury did not return a verdict contemporaneously with the Surrender Note, but instead awaited a response from the court. This strongly suggests that the Surrender Note was a plea for guidance rather than confirmation that the author had truly and permanently abandoned his or her duties and convictions." 2024 IL App (4th) 240520-U, ¶ 24.

¶ 26      It was within the trial court's discretion to determine whether the Surrender Note was evidence of juror misconduct that required the court to declare a mistrial.

The trial court rejected plaintiff's claim that the author's clear, unambiguous statements in the Surrender Note would not be cured by further instruction from the court and denied plaintiff's motion for a mistrial. We agree with the appellate court that a different, reasonable interpretation of the Surrender Note supported the trial court's decision to deny plaintiff's claim that a mistrial should have been granted because the Surrender Note constituted juror misconduct. We will not second-guess or substitute our judgment for that of the trial court, as the trial court's denial of plaintiff's motion for a mistrial was not arbitrary or fanciful, nor can we say that no reasonable person would adopt the view of the trial court.

¶ 27        Plaintiff then cites *United States v. Fattah*, 914 F.3d 112 (3d Cir. 2019), in support of his claim that the Surrender Note was evidence of juror misconduct. In *Fattah*, the trial jury twice complained to the trial court that "Juror 12" refused to vote by the letter of the law, would not listen or reason, and had an " 'agenda or ax to grind' " with the government. *Id.* at 140. The jury also complained that Juror 12 was argumentative and constantly screamed at the other jurors. *Id.* at 140-41. In addition, Juror 12 told the courtroom deputy that he was going to hang the jury and that " 'it's going to be 11 to 1 no matter what.' " *Id.* at 143. The district court noted that Juror 12 made these statements after the jury had deliberated for only four hours, following a five-week trial. *Id.* at 145. The district court therefore dismissed Juror 12. *Id.* at 144-45. The Court of Appeals for the Third Circuit affirmed the district court's decision to dismiss the juror, determining that the record supported the district court's finding that Juror 12 refused to deliberate in good faith and was intent on hanging the jury. *Id.* at 148.

¶ 28        Plaintiff argues that the juror misconduct in this case was more defined and certain than in *Fattah*. We disagree. The juror in *Fattah* repeatedly stated his refusal to deliberate and his intention to hang the jury to the other jurors and to the courtroom deputy. None of the jurors in this case complained that a juror refused to deliberate or was otherwise disruptive during deliberations, nor did the other jurors single out or identify the author of the Surrender Note. In fact, the record does not indicate whether the other jurors were even aware that a juror had sent the Surrender Note. When the foreperson was asked if the jury was deadlocked following receipt of the Surrender Note, the foreperson stated that it was his understanding that the jury was deadlocked but did not further explain the reason for the deadlock or point to a particular juror as the reason for the deadlock. In

contrast to *Fattah*, plaintiff's only evidence of juror misconduct in this case is the Surrender Note. As discussed above, the Surrender Note could reasonably be interpreted as a continuation of the deadlock brought to the trial court's attention the night before rather than a refusal to deliberate in good faith. Consequently, we find the *Fattah* decision does not support plaintiff's claim that the trial court abused its discretion in denying his motion for a mistrial based on juror misconduct.

¶ 29 Plaintiff next argues that the trial court should have declared a mistrial upon receipt of the Surrender Note because the Surrender Note established that the jury was hopelessly deadlocked.

¶ 30 A trial court's discretion includes the discretion to direct a jury to continue to deliberate even when the jury has reported that it is deadlocked and unable to reach a verdict. *People v. Cowan*, 105 Ill. 2d 324, 328 (1985). There is no fixed time for determining how long a jury should be permitted to deliberate before a mistrial is declared and the jury is discharged, as great latitude is accorded to the trial court in the exercise of its discretion. *People v. Preston*, 76 Ill. 2d 274, 283 (1979). The trial court is in the best position to assess all the factors that must be considered in determining whether a potentially deadlocked jury will be able to reach a just verdict if it continues to deliberate. *Kimble*, 2019 IL 122830, ¶ 37.

¶ 31 This court has recognized several nonexhaustive factors in reviewing whether a trial court acted within its discretion in declaring a mistrial on the basis of a jury deadlock. *Id.* ¶ 38. These factors include "(1) statements from the jury that it cannot agree, (2) the length of the deliberations, (3) the length of the trial, (4) the complexity of the issues, (5) the jury's communications to the judge, and (6) the potentially prejudicial impact of continued forced deliberations." *Id.* (citing *United States v. Vaiseta*, 333 F.3d 815, 818 (7th Cir. 2003), and *United States v. Byrski*, 854 F.2d 955, 961 (7th Cir. 1988)).

¶ 32 Plaintiff argues that the first factor, which is intertwined with the fifth factor, is the most important factor and compels a finding that the deadlock in this case warranted a mistrial. Plaintiff points to *Kimble* in support of this argument, noting that the trial court in *Kimble* declared a mistrial after the jury made two statements indicating it was deadlocked and clarifying for the trial court that more time would not help it reach a verdict.

¶ 33        *Kimble*, however, did not base its decision to declare a mistrial solely on the jury's statements that it was deadlocked. In denying the parties' request for a *Prim* instruction in *Kimble*, the trial court stated that she feared there would be " 'some extremely angry jurors' " if a *Prim* instruction were given, because there had been " 'some very loud voices back there [in the jury room] for a period of time.' " *Id.* ¶ 21. The trial court explained that requiring further deliberations under those circumstances could coerce the jury into a decision. *Id.* ¶ 42.

¶ 34        In this case, there were no concerns that there would be "extremely angry jurors" if a *Prim* instruction had been given to the jury and the jury had been directed to continue deliberations. It is within the trial court's discretion to direct a deadlocked jury to continue to deliberate. The *Kimble* decision does not compel a finding that the trial court abused its discretion in this case.

¶ 35        Plaintiff also cites *People v. Richardson*, 2022 IL App (2d) 210316, as holding that the most important factor in determining whether to grant a mistrial is the first factor—statements from the jury that it cannot agree. At issue in *Richardson* was whether the trial court abused its discretion in failing to grant a mistrial when the jury twice informed the trial court that it could not reach a unanimous verdict after receiving a *Prim* instruction. *Id.* ¶ 3.

¶ 36        We find *Richardson* to be distinguishable. Statements from the jury that it could not agree were the most important factor in *Richardson* because the jury had repeatedly told the trial court that it could not reach a unanimous verdict, even after receiving the *Prim* instruction. This case is not factually similar. The instant jury had not received a *Prim* instruction prior to its declaration that it was deadlocked.

¶ 37        In reviewing all the *Kimble* factors, the appellate court concluded that those factors supported a finding that the trial court did not abuse its discretion in denying plaintiff's request for a mistrial. The appellate court noted that the parties took six days to present evidence, a significant portion of which was expert medical testimony. 2024 IL App (4th) 240520-U, ¶¶ 7, 23. The jury submitted a note that it could not come to an agreement after only 4½ hours of deliberations. The jurors were told to continue deliberations, which they did for 55 minutes before they were sent home for the evening. *Id.* The Surrender Note was received by the trial court the next morning, after the jury had deliberated for 38 minutes. *Id.* ¶¶ 8, 24. The appellate court concluded that the Surrender Note could reasonably be interpreted

as an attempt to draw the court's attention to the perceived deadlock from the previous night, as the trial court failed to provide guidance to the jury concerning the deadlock at that time. *Id.* ¶ 24. The appellate court also found it significant that the jury did not return a verdict contemporaneously with the Surrender Note, which further supported a finding that the Surrender Note was a plea for guidance rather than a refusal to deliberate. *Id.*

¶ 38     There is no mechanical formula that can be applied in reviewing a trial court's ruling on a motion for a mistrial because that ruling is "grounded in the unique facts of the particular case in which the ruling was made." *People v. Willmer*, 396 Ill. App. 3d 175, 180 (2009). The trial court was in the best position to assess whether the jury would be able to reach a verdict if it continued to deliberate. We agree with the appellate court that the *Kimble* factors, considered in light of the unique facts in this case, supported a finding that the trial court did not abuse its discretion in choosing to give the jury a *Prim* instruction and denying plaintiff's motion for a mistrial.

¶ 39     Plaintiff next argues that the *Prim* instruction did not remedy the misconduct of the author of the Surrender Note, arguing that the instruction was in fact *per se* coercive. Plaintiff claims that the jury in this case was hopelessly deadlocked to the point that the author of the Surrender Note guaranteed that he or she would abandon his or her duties and beliefs to come to a verdict. Accordingly, giving the *Prim* instruction following receipt of the Surrender Note was inherently coercive because it pushed the jury to reach a unanimous verdict.

¶ 40     In support of his claim that the *Prim* instruction was inherently coercive, plaintiff cites *People v. Wilcox*, 407 Ill. App. 3d 151 (2010), and *United States v. Williams*, 819 F.3d 1026 (7th Cir. 2016). These cases are inapposite, however, as neither case involved the giving of a *Prim* instruction. The trial court in *Wilcox* responded to a jury's deadlock with a note stating, " '[w]hen you were sworn in as jurors and placed under oath you pledged to obtain a verdict. Please continue to deliberate and obtain a verdict.' " *Wilcox*, 407 Ill. App. 3d at 163. The appellate court found that the trial court's note was equivalent to an "*Allen* charge," based on *Allen v. United States*, 164 U.S. 492 (1896). *Wilcox*, 407 Ill. App. 3d at 163. That charge urged a jury minority to reevaluate its position given the fact that a majority of the jury had heard the same evidence and had taken a different position. *Id.* at

164. Such a charge was inherently coercive, as it suggested that the jury must arrive at a verdict and did not leave open the option of returning no verdict if the jury could not reach a consensus. *Id.*

¶ 41    Similarly, the court in *Williams* instructed the jury " 'to return to your jury room and renew your deliberations since it is necessary that each juror agree, that is, your verdict must be unanimous.' " 819 F.3d at 1028. There, too, the trial court's instruction that the verdict must be unanimous was both incorrect and coercive. That instruction also failed to inform the jurors that they could return no verdict if they could not reach a unanimous verdict.

¶ 42    In *Prim*, 53 Ill. 2d at 74, this court addressed the giving of an instruction that was appropriate to guide but not coerce a jury that is unable to reach a verdict. The *Prim* court noted that the giving of *Allen* charges had been severely criticized and therefore designed an instruction to avoid the coercive language inherent in an *Allen* charge. *Id.* at 72-76. The supplemental instruction provided in IPI Civil No. 1.05 was derived from the *Prim* case. The *Prim* court concluded that the instruction would "resolve the many questions created by the uncertainty attendant upon instructing a jury that is in disagreement." *Id.* at 76. The court explained that "[j]urors, and especially those voting in the minority, conceivably could feel a coercive influence if when seeking guidance from the court they are met with stony silence and sent back to the jury room for further deliberation." *Id.* at 74.

¶ 43    As the appellate court found, plaintiff's claim that the *Prim* instruction itself was coercive when given after the Surrender Note is untenable when this court adopted the instruction specifically to avoid the possibility of undue coercion. 2024 IL App (4th) 240520-U, ¶ 28. Indeed, the facts of this case reinforce this court's reasoning in *Prim*. When the jury first notified the trial court that it was deadlocked, the trial court provided no guidance and simply directed the jurors to continue deliberating. The conceivably coercive effect of the trial court's silence is seen in the Surrender Note, where the author stated that he or she would vote with the majority solely to end deliberations. After the trial court gave the *Prim* instruction, the jury continued to deliberate, reaching a verdict approximately 50 minutes later. During polling, the jury unanimously affirmed that the verdict "was then and is now" their verdict. The *Prim* instruction thus did exactly what it was intended to do by providing guidance to the deadlocked jury. The *Prim* instruction is not

inherently coercive. The trial court therefore did not abuse its discretion in denying plaintiff's motion for a mistrial and instead giving the jury a *Prim* instruction following receipt of the Surrender Note.

¶ 44 Having found that the trial court did not abuse its discretion in denying plaintiff's motions for mistrial, we next address plaintiff's claim that the trial court abused its discretion in refusing to conduct additional polling beyond asking the jurors, "was this then and is this now your verdict?" Plaintiff notes that the record reflects that juror 34, when polled, gave a long pause, sighed loudly, and then hesitantly said, "yes." Plaintiff maintains that this response, in combination with the Surrender Note, required further polling.

¶ 45 The purpose of polling a jury is to determine whether the verdict accurately reflects the vote reached by each juror following deliberations. *People v. McDonald*, 168 Ill. 2d 420, 462 (1995). When a jury is polled, each juror should be questioned individually whether he or she truly assents to the verdict. *People v. Kellogg*, 77 Ill. 2d 524, 528 (1979). This court has approved the use of the question "was this then and is this now your verdict?" when polling a jury. *People v. Williams*, 97 Ill. 2d 252, 306-07 (1983).

¶ 46 In polling a jury, a trial court must not hinder a juror's expression of dissent during the polling. *Id.* at 307. If a juror indicates some hesitancy or ambivalence in his polling answer, the trial court must determine the juror's present intent by allowing the juror to make an unambiguous reply concerning his present state of mind. *McDonald*, 168 Ill. 2d at 462-63. This court has cautioned, however, that a trial court must be careful not to make the "polling process another arena for deliberations" in attempting to determine a juror's present intent during polling. *Kellogg*, 77 Ill. 2d at 529.

¶ 47 In determining whether a juror has freely assented to the verdict during the polling of the jury, the trial court not only hears the juror's response but also observes the juror's demeanor and tone of voice. *People v. Cabrera*, 116 Ill. 2d 474, 490 (1987). A trial court's determination that a juror has voluntarily assented to a verdict will not be set aside unless the trial court's conclusion is clearly unreasonable. *Id.* Accordingly, this court applies an abuse of discretion standard to its review of a trial court's determination that a juror has freely assented to the verdict.

- 14 -

¶ 48 Plaintiff initially argues that the circumstances of the Surrender Note alone required further polling of the jury beyond asking "was this then and is this now your verdict?" Plaintiff claims that the polling of the jury simply affirmed that the author of the Surrender Note fulfilled his or her promise to vote solely to end deliberations. Plaintiff maintains that additional polling should have been done to ensure that the author of the Surrender Note had in fact reconsidered his or her prior statement that he or she would vote solely to end deliberations.

¶ 49 We disagree. The author of the Surrender Note had the opportunity to disclose any coercion, mistake or dissent from the verdict during the polling. The jurors, however, all answered "yes" when asked whether the verdict was their verdict. Consequently, there was no reason for the trial court to conduct further questioning. To conduct additional polling as plaintiff suggests would, as *Kellogg* cautioned, improperly turn the polling process into another arena for deliberations.

¶ 50 Plaintiff then argues that juror 34 expressed clear hesitation during polling by giving a long pause and sighing loudly before answering "yes" to the polling question. Plaintiff claims that the pause and sigh alone justified further polling and argues that the juror's response is even more problematic considering the Surrender Note.

¶ 51 Plaintiff cites *Kellogg*, 77 Ill. 2d 524, in support of his claim that the trial court should have conducted additional polling. In *Kellogg*, during polling of the jury, a juror was asked, " 'was this then and is this now your verdict?' " *Id.* at 527. The juror responded, " 'Yes. Can I change my vote?' " *Id.* The trial court replied, " 'The question is, was this then and is this now your verdict?' " *Id.* When the juror did not answer, the trial court repeated the question. The juror then responded, " 'Yes, Sir.' " *Id.* Judgment was then entered on the verdict and the jury was discharged. The appellate court reversed, finding that the trial court erred when its subsequent questioning denied the juror an opportunity to dissent. *Id.*

¶ 52 This court affirmed the appellate court, stating:

"Jurors must be able to express disagreement during the poll or else the polling process would be a farce and the jurors would be bound by their signatures on the verdict. Before the final verdict is recorded, a juror has the right to inform the court that a mistake has been made, or to ask that the jury be permitted to

- 15 -

reconsider its verdict, or to express disagreement with the verdict returned. If the trial judge determines that any juror does dissent from the verdict submitted to the court, then the proper remedy is for the trial court, on its own motion if necessary, to either direct the jury to retire for further deliberations [citation], or to discharge it [citation]." *Id.* at 528-29.

This court concluded that the juror's question, " 'Can I change my vote?' " indicated that the juror had some reluctance to abide by the verdict, and the ambiguous response should have caused the trial court to focus on the juror's feeling concerning the verdict. *Id.* at 530.

¶ 53 In contrast to *Kellogg*, this court in *Cabrera*, 116 Ill. 2d 474, rejected the defendant's claim that he was denied his right to a unanimous jury because the trial court did not conduct further inquiry when a juror was questioned concerning her verdict. When asked whether this was and is now her verdict, the juror responded, " 'Can I say what I have to say, or do I have to give a yes, or no answer?' " *Id.* at 488-89. The trial court responded, " 'I want a yes or no answer. Was this and is this now your verdict?' " *Id.* at 489. The juror said, " 'I found in my own person mind—' " *Id.* The trial court stated, " 'I said I want a yes or no answer. Was this and is this now your verdict?' " *Id.* The juror then responded, " 'Yes.' " *Id.* Following polling of the jury, the defendant asked the trial court to further inquire of the juror on the basis that it was " 'obvious she wanted to say more than a yes or no answer.' " *Id.* The trial court denied the defendant's request and also denied the defendant's motion for a mistrial. *Id.* The appellate court affirmed the trial court. *Id.* at 479.

¶ 54 This court then affirmed the lower courts. *Id.* at 495. This court stated that, when the juror understood that she was to respond with a yes or no answer, the juror unequivocally answered "yes." *Id.* at 490. *Cabrera* distinguished *Kellogg* on the ground that the juror in that case asked whether she could change her vote when being polled. *Id. Cabrera* also distinguished *People ex rel. Paul v. Harvey*, 9 Ill. App. 3d 209, 210 (1972), where a juror, upon being asked if the verdict was his, responded, " 'Well, it wasn't exactly, no.' "

¶ 55 In a similar case, this court held that a juror's response of " 'Reluctantly, yes your Honor,' " during polling in a death penalty case was not equivocal or indicative of a possible dissent from the verdict. *McDonald*, 168 Ill. 2d at 461. The

*McDonald* court concluded that it was not clearly unreasonable for the trial judge to accept the juror's assent to the verdict without conducting further questioning, noting that any juror might feel reluctance about passing judgment in a case involving a death sentence. *Id.* at 463.

¶ 56     It is clear from the preceding cases that a juror must express dissent to a verdict or provide an ambiguous response to require the court to continue polling the juror. Juror 34's long pause and loud sigh prior to answering "yes" to the jury polling in this case did not express dissent nor was it ambiguous. Juror 34's response was not comparable to the *Kellogg* juror asking if she could change her vote. Juror 34 did not express disagreement with the verdict returned or otherwise indicate that he wanted to change his vote. Plaintiff's jury had an opportunity to express disagreement during polling in this case. None of the jurors did so. The trial court thus did not abuse its discretion in denying plaintiff's motion for further polling beyond asking the jurors "was this then and is this now your verdict?"

¶ 57     CONCLUSION

¶ 58     For all the foregoing reasons, we affirm the judgment of the appellate court, which affirmed the judgment of the circuit court.

¶ 59     Judgments affirmed.